# SUPREME COURT OF ARKANSAS

**No.** CR–12–118

| | |
|---|---|
| RICKEY DALE NEWMAN<br><br>APPELLANT<br><br>V.<br><br><br>STATE OF ARKANSAS<br><br>APPELLEE | **Opinion Delivered** January 16, 2014<br><br>APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT [NO. 17-CR-2001-109]<br><br>HONORABLE GARY COTTRELL, JUDGE<br><br><u>REVERSED AND REMANDED</u>. |

**COURTNEY HUDSON GOODSON, Associate Justice**

Appellant Rickey Dale Newman appeals the order entered by the Crawford County Circuit Court denying his petition for writ of error coram nobis. For reversal, Newman contends that the circuit court erred (1) by denying his motion for judgment on the pleadings; (2) in finding that he was competent to stand trial; (3) by refusing to admit evidence of his innocence; (4) in finding that the prosecution did not fail to disclose exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); and (5) by refusing to consider other alleged discovery violations. We find merit in the second issue raised on appeal and reverse and remand for a new trial. Because Newman is receiving a new trial based on the issue of competency, we need not address the remaining arguments on appeal. *See Dimas-Martinez v. State*, 2011 Ark. 515, 385 S.W.3d 238.

*Factual Background*

The record in this case discloses that, in late January 2001, officers with the Van Buren Police Department arrested transients Marie Cholette and her boyfriend, John Evans. Although Cholette was discharged the next day, Evans remained incarcerated, and Cholette stayed in the area awaiting Evans's release. On February 15, 2001, Benny Billy, another transient who was known as "Indian Billy," discovered Cholette's decomposing body in a tent at his hobo camp located in the vicinity of Lee Creek Park. Cholette had been brutally murdered. According to the medical examiner, she had sustained an antemortem wound to her neck that measured eight-and-one-quarter inches long and which transected the right carotid artery. Cholette had suffered multiple stab wounds and lacerations to her chest, and her nipples had been removed. She also had been sliced open from her sternum to her pelvic bone, exposing her intestines. Her liver had been removed from her body, one half of which was missing from the crime scene. In addition, while alive, Cholette had sustained extensive trauma to her anus and vagina, which had been cut out of her body. Cholette's jaw had been broken, and she had received significant contusions to her left eye. She had multiple contusions on her arms that were described as defensive wounds. The autopsy also disclosed that Cholette's pelvis contained ashes and burned debris. Testing revealed that Cholette had a therapeutic concentration of amitriptyline in her system, as well as a small amount of alcohol.

Also on February 15, 2001, Van Buren police officers interviewed Newman, who was also a transient rail rider, but who had grown up in the area and still had family who lived

2

there. In his statement, Newman, whose rail name was "Renegade," claimed that he had gone to the area referred to as the "T-camp" with Cholette, where they had met a trio of men whom Newman identified as "Psycho," "Snake," and "Copper." Newman said that Cholette and the three men were huffing paint and that he decided to leave Cholette at the camp because the men were "crazy," as they were speaking of "satanic worship" and the need to perform a "human sacrifice once a week." Newman also told the officers that the men said that they were staying "up there by Indian Billy's" camp. Newman denied knowing anything about Cholette's murder. However, he agreed to give blood and hair samples for DNA analysis.

Detective Brent Grill of the Van Buren Police Department interviewed Newman again on March 2, 2001. During this interview, Grill advised Newman that he had learned from Newman's uncle, Doug Ross, that Newman had taken Cholette to Ross's house and that Ross had driven them to the Shamrock Liquor Store. Grill also informed Newman that he had obtained a video from the liquor store dated February 7, 2001, showing Newman and Cholette inside the store buying wine and cigarettes. Newman was wearing a camouflage coat during the interview, and Grill also asked Newman what had happened to the jacket that Newman had been wearing in the video. Newman replied that he had traded the coat at the Rescue Mission, a facility near the railroad tracks where transients were fed and provided a place to spend the night. Eventually, Newman confessed to the murder. He said, however, that "I'll never say I did it. I'll [sic] Psycho probably did it. Rickey Newman didn't do it." Newman asked to write his statement, and Newman explained that at home he was known

as Rickey Newman and that he was Renegade on the track. He wrote that he becomes "Seaco" when he blacks out and that he cannot control "Seaco." Further, Newman wrote that when he becomes "Seaco" he will kill "anyone he see[s] as a threat" and stated that he was "guilb [sic] of all this."

Grill arrested Newman following this interview, and officers executed a search warrant at the home of Newman's adoptive mother to obtain articles of his clothing. The prosecuting attorney subsequently charged Newman with capital murder. At his arraignment on March 27, 2001, Newman expressed the desire to waive all of his rights and to plead guilty. The circuit court did not accept the guilty plea and appointed Robert Marquette, a public defender, to represent him. At a hearing on May 9, 2001, Newman informed the circuit court that he had fired Marquette. After warning Newman of the disadvantages of self–representation, the court permitted Newman to represent himself. The circuit court left Marquette as stand-by counsel and available to Newman if he wanted "to ask [Marquette] anything about the law."

While in jail awaiting trial, Newman wrote numerous letters to the circuit court and to the prosecuting attorney. In them, he at times proclaimed his innocence. On other occasions, he professed guilt and insisted that he receive the death penalty. Newman also repeatedly asked for the evidence to be turned over to him. In March 2002, Newman filed a motion seeking the production of evidence, and the circuit court held a hearing on this request on March 27, 2002. During the hearing, the prosecution tendered the police report of Detective Grill; the initial findings from the crime lab concerning cause of death; a

laboratory-analysis report from the crime lab; the report of Newman's mental examination; and the medical examiner's autopsy report. The following day, Newman acknowledged the receipt of 214 pages of documents from the prosecution. The prosecuting attorney subsequently filed a supplemental response to Newman's discovery motion that included additional reports of laboratory analysis performed at the crime lab and other police reports.

On April 8, 2002, the circuit court conducted another hearing. At that time, Newman informed the court that Marquette was going to examine the witnesses at trial but that he (Newman) wished to make a statement to the jury. On May 7, 2002, Newman executed and filed of record a written waiver of the right to counsel.

On May 9, 2002, Newman initiated contact with law enforcement officers, and he gave another statement. In this statement, Newman said that he drugged Cholette and that he "sacrificed her" when she passed out. He also stated that he "punched her eyes out" with a six-inch knife that he had bought at Walmart. Newman advised that he had hidden articles of his and Cholette's clothing and the knife he used in the rafters of a shed that had since burned. Newman recalled that the "records" stated that there were items of food on a table, and he said that, although it was not mentioned in the report, there were hot dogs that he had purchased sitting on the table. Newman further stated that he planned on killing Cholette and that he enjoyed it. He said that he killed her because she was a fraud in that she claimed to be a black-rag member of the Freight Train Riders of America but that she was a fake because her "concha," a device that is used to tie a scarf, was made of tin instead of silver. When questioned, Newman repeatedly stated that everything that he did to Cholette was

done inside of the tent.

On June 5, 2002, the circuit court held the omnibus hearing. At that time, Newman presented the testimony of Dr. Charles Mallory, a psychologist with the Arkansas State Hospital, who testified that Newman was competent to stand trial. Mallory found that Newman was not afflicted with a mental disease or defect, and he testified that he saw no signs or symptoms of multiple-personality disorder. Further, Mallory testified that, if a defendant were desirous of confessing to the crime and requesting a jury to sentence him to the death penalty, this would not of itself be an automatic symptom of mental disease or defect. He stated that a person who is rational and competent to stand trial can still have a deep and abiding conviction that he wished to pay for his crime. Based on Mallory's testimony and his report, the circuit court found that Newman was competent to stand trial.

Newman's trial began and concluded on June 10, 2002. Newman insisted on wearing jail clothing and shackles during the trial. The prosecution produced the testimony of the officers involved in the investigation; testimony from the medical examiner; testimony recounting Newman's statements and confessions; photographs of the crime scene and of Cholette's body, both as she was found in the tent and at the autopsy; testimony as to blood splatters found in the tent; and testimony that hairs microscopically similar to Cholette's were found on Newman's sweatpants, gloves, and boots; and testimony that one head hair that was microscopically similar to Newman's hair was contained in the vacuum samples taken from a sleeping bag and comforter found at the crime scene. In addition, Dr. Mallory testified that Newman was fit to proceed and that he could appreciate the criminality of his conduct at the

time of the murder.

Newman elected to testify. He said:

What happened, uh, I came into town, I met up with this lady, she was wearing a black rag and a tin concha, she was a fake. She claimed that she hurt one of our brothers during a little alteration [sic] with her and her husband, uh, I went across the bridge and I bought her alcohol. I drugged her up. I got her drunk, and I killed her. Cut her from head to toe. I killed her more than once, I killed her until I got tired of killing her, until the passion of blood went away. Then I left it lay like a dog and walked away. Washed my hands of the whole affair.

I killed her. When I told Officer Grill that Psycho killed her, that was a lie. According to all these experts, there is no Psycho. I know there's a rage in me, I know after a certain point and I am very capable of hurting real bad, and there is other cases right here in this town where I've hurt people real bad. I don't know why they wasn't brought up. A fact's a fact. I get headaches. I've probably been having them for the last nine or ten years or so; the military don't have nothing to do with this. I did get the headaches even when I was in the service.[1]

The truth is the only justice in this case is the death penalty, and as ladies and gentlemen of the jury, you got to think that could have been you, your daughter, anybody you might know. It just had to be somebody. It happened to be somebody claiming to be who she wasn't. I don't know. You probably don't understand gang activity, but we got our own turf we got to protect. Garbage's got to be taken out at all costs. If you want to ask a few questions, I'll tell you. I don't know how to tell you I'm guilty. I did it period.

During the prosecutor's closing argument, Newman became disruptive when the prosecutor suggested that Newman killed Cholette as part of a sex crime after she rejected his advances. As a result, the circuit court ordered him to be gagged with duct tape. Subsequently, the jury returned a verdict of guilty. During the sentencing phase of trial, the

---

[1] Newman served in the marines for over one year and received an honorable discharge.

prosecutor presented evidence that Newman had been convicted of second-degree battery in

1988. Newman offered no evidence in mitigation. Instead, he addressed the jury with the

following statement:

> I, Rickey Newman, freely tell the jury that I killed the lady in cold blood. I first cut her a little at a time to make it hurt, and then I stabbed her for fun and to watch her bleed. Then I cut her from her neck to her groin, and then I took some of her insides out and cooked some of her organs to see how long they would cook.
>
> Let's see—take to cook—how long it takes to cook them. I enjoyed murdering her very much and I had a lot of fun killing her and making her hurt real bad.
>
> This tells you that I am guilty of murder. The first time I saw her I knew I was going to kill her and make her hurt real bad with a lot of pain. Her family needs a little peace and comfort in their lives, and the only peace and comfort her family will ever have is to put the one that killed their loved one to death....
>
> . . . .
>
> The only verdict that will serve this horrible crime in the mutilation of the lady I killed—for the lady's peace, is for her killer to be put to death in this case. I know the jury will come back with the right decision.—And the decision is yours, jury, and only the jury's. I am—I am myself asking for the death penalty and ask for punishment in this capital murder case.
>
> . . . .
>
> I will not appeal on the right verdict of death, the only decision there is to come back with, and I will ask for a fast execution day.
>
> Thank you, ladies and gentlemen of the jury, I know you will not—I know you will do the right thing for her family, and the taxpayers, and yourself. The right justice for all is death. Come back with the right decision. Respectfully, Rickey Newman, stone-cold killer. Thank you, ladies and gentlemen.
>
> After deliberations, the jury returned a verdict of death. Accordingly, the circuit court

entered a judgment and commitment order reflecting Newman's conviction of capital murder

and sentence of death.

Subsequently, an appeal was lodged in this court. While the appeal was pending, Newman filed a pro se petition seeking to waive the appeal of the judgment so that the sentence could be executed immediately. *Newman v. State*, 350 Ark. 51, 84 S.W.3d 443 (2002) (per curiam). This court denied the request, holding that appellate review of the conviction and sentence was mandatory in a death-penalty case pursuant to Arkansas Rule of Appellate Procedure–Criminal 10 (2002). *Id.* We subsequently affirmed Newman's conviction and sentence. *Newman v. State*, 353 Ark. 258, 106 S.W.3d 438 (2003).

Following the issuance of this court's mandate, the circuit court held a hearing, pursuant to Arkansas Rule of Criminal Procedure 37.5(b) (2002), to consider the appointment of counsel to represent Newman in postconviction proceedings. *See State v. Newman*, 357 Ark. 39, 159 S.W.3d 309 (2004) (per curiam). During the hearing, the circuit court advised Newman of his rights with respect to Rule 37.5 relief, specifically informing Newman that any waiver of those rights and Newman's willful failure to pursue relief under Rule 37.5 would result in the death sentence being carried out against him. *Id.* In sworn testimony to the circuit court, Newman stated that he wished to waive his rights to an attorney and to waive his right to postconviction relief. *Id.* Thereafter, the circuit court entered an order concluding, in relevant part, that Newman was competent to waive his right to postconviction relief. *Id.*

The State subsequently filed a petition requesting that this court lodge the record of the waiver proceedings and review the circuit court's order. We denied the State's petition,

due to Newman's statement during the waiver hearing that he was under the influence of his medication, namely Thorazine. *State v. Newman*, 355 Ark. 265, 132 S.W.3d 759 (2003) (per curiam). Accordingly, we remanded the matter for the sole purpose of having the circuit court order the Arkansas State Hospital to conduct an evaluation of Newman to determine whether he was competent to proceed with the Rule 37.5 hearing and to waive his rights under that rule. *Id.*

Pursuant to our remand, Dr. Mallory conducted an examination of Newman and concluded that Newman did not suffer from any mental disease or defect and that he had the capacity to make a knowing, intelligent, and voluntary waiver of his right to have an attorney advise him on his postconviction rights. *Newman*, 357 Ark. 39, 159 S.W.3d 309 (2004). Following receipt of Dr. Mallory's report and after hearing Newman's own testimony regarding the waiver, as well as Newman's testimony that he agreed with Dr. Mallory's determination of competency, the circuit court found that Newman was competent and had knowingly and voluntarily waived his postconviction rights under Rule 37.5. *Id.* We affirmed the circuit court's decision. *Id.*

Later, through appointed counsel, Newman filed a petition for federal habeas corpus relief in the United States District Court for the Western District of Arkansas. At hearings before the federal district court, Newman presented new evidence that Dr. Mallory, the sole witness at Newman's state competency hearings, used improper tests to determine Newman's competency; improperly administered Newman's tests; and incorrectly graded the test he administered to Newman, resulting in a higher IQ score. *See Newman v. Norris*, 597 F. Supp.

2d 890, 895 (W.D. Ark. 2009). In addition, Newman presented evidence, not considered by the state courts regarding the reasonableness of his legal decisions at the time of his trial and appeals, as well as evidence not considered by the state courts regarding his claim of actual innocence. *Id.* Accordingly, the federal district court concluded that Newman had failed to exhaust all of his claims in the state courts and directed Newman to return to state court to pursue further postconviction relief. *Id.*

Newman then petitioned this court to reinvest jurisdiction in the circuit court to allow him to seek a writ of error coram nobis. *Newman v. State*, 2009 Ark. 539, 354 S.W.3d 61. In his petition, Newman alleged that he was incompetent at the time of trial and that the prosecutor had withheld exculpatory evidence in violation of *Brady v. Maryland*, *supra*. *Id.* Newman acknowledged that he had sought the death penalty in this case and that he had attempted to waive his direct appeal. *Id.* However, he stated that he was not motivated to secure a death sentence because of remorse or the desire to take responsibility for a wrong he had committed. *Id.* On the contrary, he claimed that he was entirely innocent of the murder. *Id.* Further, Newman maintained that he had wished to be executed because his impaired thinking made him believe that death was more bearable than continuing to live. *Id.*

This court granted Newman permission to pursue coram nobis relief on both grounds. As to the issue of competency, we held:

> We agree that Newman appears to have a meritorious claim regarding his incompetence at the time of trial. Dr. Mallory provided the only evidence of Newman's competency to stand trial. Subsequently, in federal district court, Dr. Mallory admitted that he made significant scoring errors when administering tests to Newman. These scoring errors undermine the validity and reliability of Dr. Mallory's testimony at trial. Dr. Mallory's declaration of

Newman's competence is suspect, as it was based upon flawed data. This, together with Newman's exhibits, affidavits, and proposed testimony in support of his petition, warrant granting permission for leave of the court in this case.

*Id.* at 10–11, 354 S.W.3d at 67. Regarding the *Brady* claims, this court stated:

Based upon the record before us, we conclude that it appears that there were possible *Brady* violations in this case. We are mindful of Newman's confessions; however, Newman has presented evidence that he might have been incompetent when he made the confessions. As such, we are in no position to determine whether, had the suppressed evidence been disclosed to the defense and presented at trial, there is a reasonable probability that the judgment of conviction would not have been rendered. This determination must first be made by the circuit court. We add that, for the reasons previously stated, Newman exercised diligence in his claim of *Brady* violations. Based upon the foregoing, we grant Newman's petition to reinvest jurisdiction in the circuit court to seek a writ of error coram nobis on his claim of *Brady* violations.

*Id.* at 18, 354 S.W.3d at 71. Based on these findings, we granted permission for Newman to file a petition for writ of error coram nobis limited to the claims of whether he was competent to stand trial and whether there were *Brady* violations in his case.

Upon returning to circuit court, Newman filed a thirty-six-page petition for writ of error coram nobis. In addition, Newman submitted a motion for judgment on the pleadings in which he argued that the record of trial demonstrates that the trial judge should have entertained serious doubts as to his competency to stand trial, such that the trial judge should have held a hearing on the issue. Further, Newman argued that the trial judge's failure to do so entitled him to a new trial due to the denial of procedural due process.

The circuit court denied the motion for judgment on the pleadings by an order dated March 19, 2010. The circuit court held a hearing on the coram nobis petition on March 10 through 18, 2011. At the hearing, the circuit court declined to consider evidence of

Newman's innocence that he argued was pertinent to the issue of mental competency and the *Brady* claims. The court also excluded from its consideration three alleged *Brady* violations because they were not among those presented to this court in granting leave to proceed with coram nobis relief. Subsequent to the hearing, but prior to the circuit court's entry of an order, Newman filed a motion to supplement the record with additional evidence regarding one of the *Brady* claims. The circuit court denied this motion on July 14, 2011, and the court entered an order denying the petition for writ of error coram nobis on July 15, 2011. In its order, the circuit court found that Newman had been competent to stand trial and that the prosecution did not fail to disclose exculpatory evidence. It is from this order that Newman prosecutes the instant appeal.

*Standard of Review*

The State maintains that the circuit court's decision must be judged under the substantial-evidence standard of review. However, the State is mistaken. The substantial-evidence standard is the test that prevails on review of a circuit court's competency determination made at trial. *See Thessing v. State*, 365 Ark. 384, 230 S.W.3d 526 (2006). By contrast, this is an appeal from the circuit court's denial of coram nobis relief. The standard of review for the denial of a petition for writ of error coram nobis is whether the trial court abused its discretion in granting or denying the writ. *Magby v. State*, 348 Ark. 415, 72 S.W.3d 508 (2002) (citing *State v. Larimore*, 341 Ark. 397, 17 S.W.3d 87 (2000)). An abuse of discretion occurs when the circuit court acts arbitrarily or groundlessly. *Isom v. State*, 356 Ark. 156, 148 S.W.3d 257 (2004). The trial court's findings of fact, on which it bases its

decision to grant or deny the petition for writ of error coram nobis, will not be reversed on appeal unless they are clearly erroneous or clearly against the preponderance of the evidence. *Green v. State*, 343 Ark. 244, 33 S.W.3d 485 (2000). A finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Davenport v. State*, 2013 Ark. 508, ___ S.W.3d ___.

*Competency to Stand Trial*

On appeal, Newman contends that the circuit court's finding that he was competent to stand trial is clearly erroneous and that the circuit court's denial of coram nobis relief on the issue of competency constitutes an abuse of discretion. Newman argues that the circuit court failed to take into account the testimony of his expert witnesses and their opinions that he lacked the capacity to make rational, self-protective decisions. He also asserts that the circuit court misplaced its reliance on the testimony of the State's expert witness.

In support of his claim of incompetency, Newman presented the testimony of Dr. Pablo Stewart, a forensic psychiatrist. Stewart conducted a total of four clinical interviews with Newman: twice in October 2006, once in June 2007, and once again in February 2011. He diagnosed Newman with chronic post-traumatic stress disorder (PTSD); major depressive disorder; cognitive dysfunction, especially as it involves executive functioning; and polysubstance dependence. Stewart testified that there was a synergy between substance abuse and PTSD and depression in that persons afflicted with these disorders self-medicate with drugs to address the symptoms of the diseases. Stewart based the diagnosis of PTSD on the

recurring trauma Newman experienced as a child, which he called the "most depraved that I've worked with." Stewart recounted that Newman was raised in abject poverty by a neglectful mother who married a man who "terrorized" the family for seven years of Newman's young life. Newman witnessed the beatings of his mother and his siblings, and he also was subjected to repeated, "merciless" beatings and torture, which included being chained outside to a tree or a stake, sometimes overnight. His mother and her husband also left the children alone to fend for themselves without food for days or weeks at a time. His mother died in the home when he was eleven or twelve years old after a painful, year-long battle with cancer. Stewart testified that Newman would become agitated and anxious when topics came up that reminded him of the trauma, and he said that Newman's reactions to these associative memories were reflexive and automatic.

With regard to the diagnosis of major depression, Stewart said that the features of this disorder were a sad or irritable mood and the lack of ability to experience pleasurable activities. He said that persons who have this illness experience an excessive sense of worthlessness and guilt. Stewart said that the illness results in cognitive distortions and the inability to think clearly and rationally. He said that another symptom of major depression is chronic thoughts of death and suicidality. Stewart stated that Newman made it very clear that he wanted to die. Stewart believed that Newman's desire to be executed and his suicidal ideation were symptomatic of the cognitive distortions created by his depression. He said that this desire was not an informed choice but that it was rather a reflection of his cognitive impairments superimposed with his psychiatric disorders. He testified that Newman's

conditions and impairments affect his ability to make rational, self-protective decisions and that his depression and PTSD impact him in a way that causes him to have the inability, as opposed to an unwillingness, to look at a situation and appreciate it for what it really is.

Stewart stated that Newman possessed only a superficial understanding of the proceedings and that he did not have a rational understanding of his legal situation. Stewart rescored the three-part MacArthur Competency Assessment Tool administered to Newman by Dr. Mallory in 2002 by using the raw data provided by Mallory. In the understanding section of the test, Stewart arrived at a score of 11, whereas Mallory gave Newman a score of 16. A score of 11 indicates that Newman had a factual understanding of the legal system in general. On the reasoning section, Stewart assessed a score of 8, while Mallory gave a score of 13. A score of 8 places Newman in the clinically significant impairment range for reasoning, which corresponds to the ability-to-assist-counsel prong of the test for competency. Therefore, Stewart concluded that Newman was clinically and significantly impaired in his ability, as opposed to an unwillingness, to assist counsel. In the appreciation section of the test, Stewart noted a glaring error committed by Mallory in that Mallory indicated that one of the questions was "not applicable;" thus he did not give a score, which resulted in Mallory arriving at a score of 8 or 10 on this section. Stewart said that the manual does not give the discretion to pick and choose the questions that are asked. Even so, Stewart testified that a score of 8 places Newman in the clinically significant impairment range. When Stewart rescored this section, he arrived at a score of 4, meaning that Newman was impaired in his rational understanding of his legal situation. Stewart testified that, in his opinion, Newman

was not competent to stand trial. He felt, however, that Newman's conditions were treatable.

Additionally, Stewart noted that Newman was not capable of being interviewed by him without becoming agitated, particularly when being questioned about his childhood. Stewart testified that Newman once attempted to fire both him and Newman's attorney during one of the interviews. He noted also that Newman had not been willing to be interviewed by Dr. Gray from the state hospital, and Stewart said that this decision was not rational and was indicative of ongoing mental illness.

Dr. Ricardo Weinstein, a forensic neuropsychologist, also testified on Newman's behalf. Although Newman refused to meet with Weinstein in advance of the coram nobis hearing, Weinstein had previously interviewed Newman twice in October 2005. After having Newman complete a battery of tests, Weinstein concluded that Newman has significant cognitive deficits and brain dysfunction with particular compromise to the frontal lobes of the brain. Using the Wechsler Adult Intelligence Scale (WAIS-III), Weinstein assessed Newman's full-scale IQ at 67, a score that placed Newman in the range of intellectual disability. Newman scored a 55 on another IQ test. According to Weinstein, the results of these tests demonstrated that Newman had a compromised working memory. Weinstein did not assess Newman's adaptive-functioning abilities to determine whether he was mentally retarded because Newman would not permit it. Newman also attained low scores on the Wide Range Achievement Test on reading, spelling, and arithmetic, and his scores on this test placed him below the first-grade level. Newman also did poorly on the Facial Recognition Test that is aimed to identify problems in appreciating social cues. On the Ray Complex

Figure Test, Newman's performance indicated that he lacked the ability to plan and to determine what is relevant and what is not relevant. On a test designed to measure executive functioning, Newman scored three standard deviations below the mean, which signified that less than one percent of the population obtain a score that low. Weinstein noted that Newman showed no signs of malingering and that Newman's effort in completing the tests suggested that he was performing to the best of his ability.

Weinstein concurred in the diagnoses of PTSD and major depressive disorder. He said that these conditions limited Newman's ability to think and that persons suffering from those conditions do not perceive things correctly and do not process information adequately. Weinstein also opined that Newman does not understand the meaning of a right and that he has a limited ability to understand court proceedings. Weinstein testified that he asked Newman about the crime, and Weinstein said that Newman told him the same thing that he had first told the police, namely that he had left Cholette alive at the T-camp. Weinstein stated that Newman informed him that he could not commit suicide, as he considered it cowardly, and that he admitted guilt only because he wanted to be killed and put out of his misery.

Weinstein further testified that Newman was not capable of making rational decisions and that he was not aware of the consequences of his choices. He said that Newman's impairments have an impact on his ability to make decisions that are self-protective. Ultimately, Weinstein concluded that Newman was not competent to stand trial:

> In Mr. Newman's capital trial in 2002, he was suffering from major mental disease in the form of major depression; post traumatic stress disorder; and he

was suffering from cognitive limitations. So, he had both major mental illness and a condition that would limit his capacity to understand certain concepts. I don't think he had the capacity to consult with counsel with a reasonable degree of rational understanding, and to have a rational and factual understanding of the proceedings against him. I think the mental disease and disorder that he experiences impinging his ability, as we said before, trusting an attorney; communicating with an attorney; following legal proceedings; intervening in a logical, rational matter; communicating information in a logical, rational manner to the attorney; trusting the attorney.

Finally, Weinstein opined that Newman has the capacity to be restored to competency with proper medication and psychiatric intervention.

Dr. Clint Gray, a psychiatrist at the state hospital, testified for the State. Gray was not able to interview Newman because Newman refused to be evaluated by him, and this was Gray's first attempt at performing a retrospective competency evaluation. In his testimony, Gray did not dispute Weinstein's assessment of Newman's cognitive impairments and low intellectual functioning. He did not disagree with Weinstein's conclusion that Newman was not malingering. He also agreed with Stewart's diagnoses of PTSD and depression. Gray said, however, that the presence of these disorders does not automatically mean that Newman was incompetent to stand trial. In forming his opinion, Gray focused on the numerous letters that Newman had written before trial, as he said that they gave insight into Newman's abilities at the time of trial. He testified that the letters were coherent and goal-directed. Gray noted that Newman spoke of his constitutional rights, indicating that Newman knew that certain things are guaranteed under the law. Gray observed that Newman demanded evidence from the crime lab and expressed the idea that he was entitled to the information because he was acting as his own attorney. In other letters, Newman kept asking for evidence

to be provided to him, and he mentioned that he was writing his own opening and closing statements. According to Gray, these requests indicated that Newman was making reasonable preparations for his trial. Gray made the observation from one letter that Newman, in reference to a crime-lab report, understood that the microscopic similarity of hairs was not a basis for personal identification and that Newman was also aware that there was no fiber evidence connecting him with the offense. In yet another letter, Newman asked why no DNA tests had been performed on the blood, which Gray considered reasonable and rational. Newman also wrote that his family wanted him to "play like I'm mentally ill," but Newman stated that he would not do so, which meant to Gray that Newman understood that this was a defense option. In a letter written close to trial, Newman spoke of asking the jurors questions about whether they believed in the death penalty. Gray testified that the letters, as well as Newman's statements in court, demonstrated that Newman understood that he was charged with capital murder and that the penalty for that offense was death. Finally, Gray relied on a letter Newman had written to the Veterans Administration advising of his situation and wanting the benefits to go to his mother. In addition, Gray referenced the medical records from prison noting the absence of psychosis.

Gray was also impressed by Newman's ability to undergo evaluations and to complete the psychological tests. He testified that Newman's ability to give full effort on the testing suggested that he could assist his attorney at trial.

Gray testified that, although Weinstein scored Newman's IQ at 67, no testing for adaptive functioning had been done for a diagnosis of mental retardation. He said, however,

that there was evidence that Newman's adaptive functioning was good in that, even though he was a vagrant, he fed himself; showed up at the homeless shelter at appropriate times; and that he managed to get his government check every month. He did say, however, that there was room for disagreement as to whether Newman's adaptive abilities would place him in the category of being mentally retarded.

Gray also rescored the MacArthur Competency Assessment Tool given by Mallory. In the understanding section, he gave a score of 13 or 15, which would fall in the minimal or no-impairment range. For reasoning, he gave a score of 10, which indicates mild impairment. For appreciation, he gave a score of 6 or 8, which falls within the clinically significant impairment range. Overall, Gray's opinion was that Newman had the capacity to understand the proceedings and to effectively assist in his own defense at the time of trial.

On cross-examination, Gray stated that it was not his job to determine if Newman made poor choices, but he said that someone can make poor decisions and still be fit to stand trial. Gray acknowledged that major depressive disorder is a serious mental illness that can cause a diminished capacity to think and to concentrate and that recurring thoughts of death and suicide are common among patients who have this disorder. He agreed that severe depression causes cognitive distortions and that sufferers of the disease have skewed perceptions of reality. Gray also agreed that PTSD is a debilitating condition. He acknowledged that a person with cognitive impairments in executive functioning has an impaired ability to think abstractly and difficulty in assessing the consequences of different behaviors. When asked about Newman's desire for the death penalty, Gray said that

Newman also gave a reason that was different from depression, which was justice for the victim's family. He acknowledged that the request for death could be a product of depression, but he stated that it could also be a reasonable request for justice. Gray agreed that, if a desire for execution was a product of mental illness and cognitive distortions, a person making that request would not be competent to make that decision. Gray said that many of Newman's symptoms were consistent with depression and PTSD but that the same symptoms could also be attributed to Newman's personality style.

The circuit court also heard the testimony of Marquette. In his testimony, Marquette stated that he had received a tip from a person at the mission indicating that someone else had committed the murder. This information led him to believe that Newman may have witnessed the murder but that he was not the actual killer. Marquette testified that, despite Newman's instructions to the contrary, he began to investigate the tip but learned that the person he was investigating had died. He said, however, that Newman was not allowing him to do anything to help and that he was sure that Newman would not have allowed him to put the person on the witness stand, even if he had been able to locate the man. Marquette testified that Newman did not permit the hiring of an investigator and that Newman refused another psychological evaluation. He also said that Newman did not want him to interview any witnesses. Marquette further testified that he moved for a directed verdict at trial even though Newman had told him not to make the motion.

In addition to the testimony, we also note that Newman had several outbursts during the coram nobis hearing. For example, he interrupted Stewart's testimony, called Stewart a

"liar," and asked that he be removed from the witness stand. At one point, Newman did not appear to know whether he was in state or federal court. During his exchange with the circuit court, Newman stated,

> She [Newman's counsel] walked into my life, and my whole life changed. And it's just, I'm working to die, and she's working – I ain't actually figured out what she's working on, but I think she – like I said, I'm working to die, and she's working against me to die. They're taking my choice away. But I guess that's the law. I don't understand why the law says I can't die. That's the whole point, I can't – can't grasp. It's my choice.

On another occasion, Newman asked for his execution and to end the proceedings. During the course of this outburst, he said the following:

> I think the law, the way I understand – you see, I ain't real smart. Ms. Brain's [Newman's counsel] got me a dictionary and if you watch her – I try to write how much words down I don't understand. I go back to my cell, and I look them up and try to figure out what's going on in this courtroom. And I don't have no idea. And I can't hear these people half the time. And I'm really confused right now. I really think my rights is being violated by this court. I know you ain't violating, but that's the way I feel. I think you should let me die right now. I mean, I think you should end this because I'm asking to end it.
>
> . . . .
>
> I don't understand what they're telling me. I don't understand what these people are trying to tell me. I don't understand what they're trying to do for me. They take away my right to die.
>
> . . . .
>
> The law books talk about suicide. There's some doctor that, er, he calls it assisted suicide. And it says suicide is up to the person. Now, I ain't standing – I ain't standing here – I, I'll never – I will not admit suicide – I ain't saying I'm gonna admit suicide for this. To me, a suicide is weak. That's why they have you to kill me, Your Honor, to kill me, or these people, whoever, kill me 'cause suicide is weak. A man who commits suicide is really committing suicide because he's decided and it's showing he can't deal with society. That's why

suicide people – that's why they take their own lives. A man that is executed stands up. I ain't messing with suicide. You killing me. It'd be different if I put the needle in my own arm. That's suicide. I'm being legally executed by the State; am I right?

The record also discloses that the circuit court allowed breaks during the course of the hearing when Newman interrupted the proceedings.

After taking the matter under advisement, the circuit court subsequently issued an order finding that Newman was competent to stand trial in June 2002. The court credited the testimony of Dr. Gray that, even if Newman had an IQ of 67, he could still be competent. Based on Gray's testimony and the court's own observations of Newman during the hearing, the court found that "Dr. Gray's opinion most appropriately coincides with the evidence that the Court considered during the hearing." With regard to Newman's demeanor, the court observed that he was "quiet, apologetic, made notes, discussed matters with his attorney, made statements to the Court about his wants and desires, and only became very upset, when mention was made of mental retardation, and any averment was made relative to his being molested as a child."

It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Medina v. California*, 505 U.S. 437 (1992). This bedrock principle is codified at Arkansas Code Annotated section 5-2-302(a) (Repl. 2006), which provides that a person lacking the capacity to understand the proceedings against him or to assist effectively in his defense as a result of mental disease or defect shall not proceed to trial so long as the incapacity endures. Ark. Code Ann. § 5-2-302 (Repl. 2006). A criminal defendant is presumed to be competent,

however, and the burden of proving incompetence is on the accused. *Haynes v. State*, 346 Ark. 388, 58 S.W.3d 336 (2001). To be competent to stand trial, a defendant must have "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). This court has defined the test of competency to stand trial as "whether a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational, as well as factual, understanding of the proceedings against him." *Thessing v. State*, 365 Ark. at 390, 230 S.W.3d at 532 (quoting *Haynes v. State*, 346 Ark. 388, 392, 58 S.W.3d 336, 339 (2001)); *Deason v. State*, 263 Ark. 56, 562 S.W.2d 79 (1978) (citing *Dusky v. United States*, 362 U.S. 402 (1960)). This is, essentially, a two-part test, with incompetency to stand trial being established if either part is demonstrated. *United States v. Cunningham*, 556 F. Supp. 2d 968 (S.D. Iowa 2008).

Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so. *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). Nonetheless, competence "has a modest aim: It seeks to ensure that [the defendant] has the capacity to understand the proceedings and to assist counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993). It is recognized that not every manifestation of mental illness demonstrates incompetence to stand trial. *United States v. Turner*, 644 F.3d 713 (8th Cir. 2011) (citing *Vogt v. United States*, 88 F.3d 587, 590 (8th Cir. 1996)). Similarly, neither

low intelligence, mental deficiency, nor bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial. *Lyons v. Luebbers*, 403 F.3d 585 (8th Cir. 2005).

In the present matter, all three experts were confronted with the difficult task of conducting a retrospective evaluation of Newman's competency to stand trial in June 2002. However, their efforts were necessary because of the serious mistakes made by Mallory when he formed his initial opinion that Newman was fit to stand trial. With that said, the three experts who testified at the hearing agree that Newman has significant cognitive defects and limitations. The experts are in accord that Newman's IQ lies within the range of mental disability. They all agree with the diagnoses of major depression and PTSD and the debilitating symptoms that these illnesses can produce. The experts also agree that Newman had a rudimentary understanding of the proceedings against him. The opinions diverge primarily with respect to the effect that Newman's deficits and mental illnesses have on his capacity to consult with his lawyer with a reasonable degree of rational understanding. On this prong of the competency test, Weinstein offered the opinion that Newman's efforts to engineer his own conviction and execution were neither rational nor volitional. Instead, he believed that Newman's behavior was the result of suicidality and his cognitive inability to envision and plan a tolerable life for himself. Stewart also opined that Newman's preoccupation with death and the desire to die impeded his ability to make rational, self–protective decisions. Both Weinstein and Stewart stated the opinion that Newman's capacity to effectively assist counsel and to make rational choices was overcome by a compulsion to

26

die as a combined result of his cognitive deficits and mental illnesses. On the other hand, Gray's opinion was that Newman's writings and especially his ability to complete psychological tests, and the effort Newman put forth in taking the tests, demonstrated his ability to effectively cooperate with others.

Here, the circuit court relied on the opinion offered by Gray that Newman was competent to stand trial. This court generally defers to a circuit court's determination of credibility in postconviction matters. *See Lee v. State*, 343 Ark. 702, 38 S.W.3d 334 (2001). However, a circuit court's acceptance of an expert's testimony on the issue of competency is not beyond appellate review. As explained by the Eighth Circuit Court of Appeals in *United States v. Ghane*, 593 F.3d 775, 781 (8th Cir. 2010):

> It is certainly within a district court's province to choose one expert's opinion over a competing qualified expert's opinion. *See* [*United States v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007)]. Nonetheless, in crediting an expert's opinion, it is not the opinion itself that is important, but the rationale underlying it. *See* [*United States v. Whittington*, 586 F.3d 613, 618 (8th Cir. 2009)] ("Even expert opinion on competency rises no higher than the reasons on which it is based[.]").

When we closely examine the rationale underlying Gray's opinion that Newman was competent, we are not convinced that his opinion adequately addressed the ability-to-assist prong of the test for competency. Gray's primary focus was on the letters Newman had written. Gray also considered Newman's cooperation in completing psychological testing as indicative of an ability to assist counsel. While the letters perhaps give insight into Newman's overall factual understanding of the proceedings, which comprises only one prong of the competency test, they are not a fair gauge for assessing the capacity to assist counsel with a

rational degree of understanding. Nor are we persuaded that the ability to undergo psychological testing correlates with the capacity to reasonably and rationally engage with an attorney. It appears to this court that, if completing the tests necessary to determine competency is considered an indication of competency, then only those who are incapable of completing the tests, while also not exhibiting signs of malingering, can be found incompetent. Clearly, this cannot be the test of competency. In addition, Gray's opinion is at odds with his own scoring of the MacArthur test, as the scores Gray gave revealed the presence of impairment in two categories of the test, including the part that assesses the capacity to assist counsel. Moreover, Gray recognized that Newman's suicidality could be a product of his cognitive deficits and his mental illnesses and that such a compulsion would render him incompetent to stand trial. Although Gray offered an alternative explanation that Newman may have wanted justice for the victim and her family, he did not refute the opinions of Stewart and Weinstein that Newman was driven by irrational suicidal impulses. In sum, we conclude that Gray's opinion does not provide a basis upon which to find that Newman had the capacity to assist counsel with a reasonable degree of rational understanding.

After reviewing the entire record, we are left with a definite and firm conviction that a mistake was made. Drs. Stewart and Weinstein testified that Newman was not fit to stand trial because he was unable to engage in rational, self-protective behavior. Given Newman's obvious bent on self-destruction, Drs. Stewart and Weinstein believed that Newman was not capable of cooperating with his attorney in a meaningful way. Their conclusions are fortified by the record, beginning with the manner in which Newman conducted himself before trial,

at trial, and even during the coram nobis hearing. Marquette also adamantly testified that Newman had shut down the pursuit of any defense options and strategies. As shown by the record of trial, no mitigation evidence was even offered on Newman's behalf. Taking everything into account, we are persuaded that the record overwhelmingly illustrates that Newman's cognitive deficits and mental illnesses interfered with his ability to effectively and rationally assist counsel. Therefore, we hold that the circuit court abused its discretion in denying Newman's petition for writ of error coram nobis, and we have no choice but to reverse and remand for a new trial.

Reversed and remanded.

*Julie Brain*, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Darnisa Evans Johnson*, Deputy Att'y Gen., for appellee.