Cite as 2020 Ark. 45

# SUPREME COURT OF ARKANSAS

No. CR-18-845

| | | |
|---|---|---|
| KARL D. ROBERTS | | Opinion Delivered: January 30, 2020 |
| | APPELLANT | |
| V. | | APPEAL FROM THE POLK COUNTY CIRCUIT COURT |
| STATE OF ARKANSAS | | [NO. 57CR-99-70] |
| | APPELLEE | HONORABLE JERRY RYAN, JUDGE |
| | | AFFIRMED. |

**ROBIN F. WYNNE, Associate Justice**

Karl D. Roberts appeals from the Polk County Circuit Court's order denying his amended petition for postconviction relief pursuant to Arkansas Rule of Criminal Procedure 37.5. Roberts raises nine points on appeal, none of which require reversal. We therefore affirm.

Roberts was convicted of the capital murder of twelve-year-old Andria Brewer, who was his niece, and sentenced to death in May 2000. He filed a waiver of his rights to appeal and to pursue postconviction remedies, but this court conducted an automatic review pursuant to *State v. Robbins*, 339 Ark. 379, 5 S.W.3d 51 (1999), and affirmed his conviction and sentence in *Roberts v. State*, 352 Ark. 489, 102 S.W.3d 482 (2003) (*Roberts*

*I*).[1]  The record shows that Roberts went to Andria's house when he knew her parents were

not home, ordered her to get into his truck, drove to a remote area, raped her, and then

strangled her to death.  Roberts later confessed to police.  At trial,

> the evidence showed that Andria was taken from her home by Roberts on May 15,
> 1999. According to his confession, Roberts knocked on the door, and Andria
> answered. Roberts knew that her parents were not home at the time. He told
> Andria to get into his truck. Andria then asked him what was wrong, and Roberts
> responded by telling her to just get in the truck. Andria complied. Roberts then
> proceeded on a journey of approximately ten miles that, according to Arkansas State
> Police Detective Lynn Benedict, would have taken twelve to thirteen minutes.
> Benedict also stated that the road that Roberts took continued to become darker
> and more remote, covered with low hanging trees and brush.
>
> According to Roberts's statement, Andria asked him to take her home
> several times along the way. Roberts kept on driving. He eventually stopped his
> truck on an old logging road and told Andria to get out. When she asked him what
> he was going to do, he told her he was going to "fuck" her. He told her to take off
> her shirt and lay down. He then took off the girl's pants and raped her. While he
> was violating her, Andria tried to get away from him, but he was able to hold her
> down. He told police that when he finished raping her, he knew that he could not
> let her live, because he had ejaculated inside her. He then decided to kill her by
> mashing his thumbs into her throat. Once the child turned blue and passed out, he
> dragged her body off into the woods and covered her up with limbs and brush. He
> then took her clothes and threw them off a nearby bridge, into a creek.

*Roberts I*, 352 Ark. at 507, 102 S.W.3d at 494–95.  The jury rejected Roberts's defense that

he was unable to conform his conduct to the requirements of the law due to a brain injury,

found him guilty of capital murder, and ultimately sentenced him to death.

---

[1]  In *Roberts I*, this court also affirmed the circuit court's finding that Roberts knowingly and intelligently waived his rights of appeal.  Roberts was represented on appeal by appointed counsel.

Numerous proceedings followed. *State v. Roberts*, 354 Ark. 399, 123 S.W.3d 881 (2003) (*Roberts II*) (per curiam affirming the trial court's finding, following hearing at which Roberts appeared pro se, that Roberts was competent to waive Rule 37.5 rights); *Roberts v. Norris*, 526 F. Supp. 2d 926 (E.D. Ark. 2007) (staying federal habeas corpus action while Roberts exhausted his claims in state court that he did not competently waive his right to appeal and to seek state postconviction relief); *Roberts v. State*, 2011 Ark. 502, 385 S.W.3d 792 (*Roberts III*) (dismissing appeal upon finding that the circuit court was without jurisdiction to entertain Roberts's Rule 37.5 petition, and this court was likewise without jurisdiction to hear an appeal); *Roberts v. State*, 2013 Ark. 56, 425 S.W.3d 771 (*Roberts IV*) (denying petition to recall mandate issued after this court's mandatory review of Roberts's conviction and sentence in *Roberts I* and denying petition to reinvest jurisdiction to consider writ of error coram nobis); *Roberts v. State*, 2013 Ark. 57, 426 S.W.3d 372 (*Roberts V* (handed down simultaneously with *Roberts IV*)) (holding that failure to ensure that Roberts was competent to waive his rights to postconviction relief constituted breakdown in appellate process that warranted reopening his postconviction proceedings).

In December 2014, a competence hearing was held in Polk County Circuit Court. The State presented the testimony of Dr. Mark Peacock, a forensic psychologist with the Arkansas State Hospital, and the defense presented the testimony of neuropsychologist Dr. Daryl Fujii, who specializes in psychotic disorders stemming from traumatic brain injury. Both doctors concluded that Roberts was schizophrenic and that his mental illness affected his ability to make a rational decision about his case. Although the circuit court found that

3

Roberts was competent to waive his postconviction rights, this court reversed and remanded, holding that the circuit court was clearly erroneous when it concluded that Roberts was competent to waive postconviction review. *Roberts v. State*, 2016 Ark. 118, 488 S.W.3d 524 (*Roberts VI*). Upon remand, Roberts filed a 171-page petition for postconviction relief. His final amended petition, filed on February 27, 2017, asserted eighteen claims for relief in ten pages. Roberts's pre-hearing brief included the facts and legal support for the claims in his petition.

The circuit court held a hearing on Roberts's petition on May 15–17, 2017. Defense counsel presented the testimony of eighteen witnesses, including four expert witnesses, and introduced over forty exhibits. Three mental-health experts testified for the defense. Dr. Matthew Mendel, a clinical psychologist, testified regarding the effects of extreme trauma and how that trauma shaped Roberts. Dr. Daryl Fujii, who had also testified at the 2014 hearing on Roberts's competence to waive postconviction remedies, attested to Roberts's schizophrenia and its impact on his ability to assist his counsel in his own defense and conform his conduct to the requirements of the law. Finally, Dr. Garrett Andrews, a neuropsychologist, concluded that, based on objective data, Roberts was intellectually disabled as defined by the Diagnostic and Statistical Manual of Mental Disorders (DSM). The circuit court excluded the testimony of the final defense expert, Michael Wiseman, an attorney who proffered testimony regarding the standard of care for capital attorneys at the time of Roberts's trial. Following the hearing and the completion of the transcript, the circuit court allowed the parties to file simultaneous briefs. On May 17,

2018, the circuit court entered a 95-page order denying Roberts relief on every claim. This appeal followed.

Our standard of review in Rule 37 petitions is that, "on appeal from a circuit court's ruling on a petitioner's request for Rule 37 relief, this court will not reverse the circuit court's decision granting or denying post-conviction relief unless it is clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Wood v. State*, 2015 Ark. 477, at 2–3, 478 S.W.3d 194, 197 (citations omitted). For claims of ineffective assistance of counsel, we assess the effectiveness of counsel under the two-prong standard set forth by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). *Watson v. State*, 2014 Ark. 203, at 3, 444 S.W.3d 835, 838–39. In asserting ineffective assistance of counsel under *Strickland*, the petitioner first must demonstrate that counsel's performance was deficient. *Id.* This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment. *Id.* The reviewing court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* The defendant claiming ineffective assistance of counsel has the burden of overcoming that presumption by identifying the acts and omissions of counsel which, when viewed from counsel's perspective at the time of trial, could not have been the result of reasonable professional judgment. *Id.*

5

Second, the petitioner must show that the deficient performance prejudiced the defense, which requires a demonstration that counsel's errors were so serious as to deprive the petitioner of a fair trial. *Id.* This requires the petitioner to show that there is a reasonable probability that the fact-finder's decision would have been different absent counsel's errors. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Id.*

In making a determination of ineffective assistance of counsel, the totality of the evidence must be considered. *Springs v. State*, 2012 Ark. 87, at 3, 387 S.W.3d 143, 147. Unless a petitioner makes both *Strickland* showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Sales v. State*, 2014 Ark. 384, at 6, 441 S.W.3d 883, 887. We also recognize that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *See id.* (quoting *Strickland*).

## I. *Competency to Stand Trial*

First, Roberts argues that overwhelming evidence establishes that he has long suffered from schizophrenia; that his schizophrenia rendered him incompetent to stand trial; and that trial counsel failed to investigate and present evidence of his schizophrenia during the guilt phase. Regarding the alleged deficiencies in trial counsels' performance, we conclude that counsel cannot be considered ineffective for failing to investigate Roberts's schizophrenia when the four mental health professionals who testified at trial did

6

not diagnose him as such. One of the defense experts, Dr. Mary Wetherby, noted that a diagnosis of schizophrenia was "suggested," but she went on to find that while Roberts "possessed a decreased ability to conform his behavior to the requirements of the law," he did not lack the ability to appreciate the criminality of his behavior at the time of the offense and he was competent to stand trial. Counsel's performance must be viewed from counsel's perspective at the time of trial, and Roberts was not diagnosed with schizophrenia until years later. We recognize counsel's argument that a reasonable attorney would have recognized the signs of Roberts's

mental disease; would have investigated their client's paranoia and visual and auditory hallucinations; would have followed up on Dr. Wetherby's suspicions of schizophrenia; and would have consulted another expert. With the benefit of hindsight, further investigation into mental disease may seem appropriate, but we view trial counsel's performance from their perspective at the time of trial. Based on expert reports, trial counsel focused on the mental defect caused by Roberts's childhood accident involving a dump truck. The jury heard testimony about Roberts's traumatic brain injury that resulted in a loss of 15 percent of the brain tissue in his frontal lobes, behavioral changes afterward, and expert opinions that his ability to conform his conduct to the requirements of the law was impaired and, but for the brain injury, he would not have committed the crime. Having carefully reviewed the record, we see no deficient performance by trial counsel under the standards set forth by *Strickland*.

In addition, Roberts argues that he was schizophrenic at the time of the trial and that his schizophrenia rendered him incompetent to stand trial. A petitioner may also qualify for Rule 37 relief, regardless of trial counsel's performance, if he demonstrates error so fundamental as to render the judgment of conviction void and subject to collateral attack. *Cothren v. State*, 344 Ark. 697, 704, 42 S.W.3d 543, 547–48 (2001). It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial. *Newman v. State*, 2014 Ark. 7 (citing *Medina v. California*, 505 U.S. 437, 112 S. Ct. 2572, 120 L.Ed.2d 353 (1992)). Competency to stand trial has two parts: (1) the capacity to understand the proceedings against him or her and (2) the ability to assist effectively in his or her own defense. *See Newman, supra*. This court has defined the test of competency to stand trial as "whether a defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational, as well as factual, understanding of the proceedings against him." *Id.* (citations omitted).

Here, the issue of Roberts's competency to stand trial was litigated before the trial court prior to trial, and he was found to be competent. At the postconviction hearing, Roberts's counsel presented evidence that the competency testing was flawed. In the order denying Rule 37 relief, the court found that Roberts had not overcome the previous finding of competency and that "Petitioner has not demonstrated that his current mental condition equates with his condition at the time of trial in 1999." We cannot say that the trial court's denial of relief on this point is clearly erroneous, and we thus affirm.

8

## II. *Change of Venue*

Roberts argues that trial counsel was ineffective for not pursuing a change of venue in light of the media attention in the rural judicial district where the trial was held. Lead counsel Buddy Hendry filed a motion asking for the trial to be moved to Garland County, in the neighboring judicial district, but withdrew the motion a few days later. Roberts argues that the decision to withdraw the motion was not based on trial strategy, but rather, the decision was borne out of counsel's dereliction of duty. There was testimony at the postconviction hearing that defense attorney Darrel Blount was supposed to get affidavits from citizens of Montgomery County that Roberts could not receive a fair trial there, but he failed to do so because he was busy with other things. Without those affidavits, Hendry feared the venue might be changed to the other county within the judicial district (Montgomery County), which would be worse than Polk County, where at least Roberts had family. The circuit court found that the decision to seek a change of venue is a matter of trial strategy and denied relief. *See Stalnaker v. State*, 2015 Ark. 250, at 8, 464 S.W.3d 466, 472 (per curiam) (the decision whether to seek a change of venue is largely a matter of trial strategy and therefore not an issue for debate under our postconviction rule). While we acknowledge Roberts's argument that the evidence in this case falls outside the typical venue decision that is a matter of trial strategy, we nonetheless find no clear error in the circuit court's denial of relief on this point. To establish that the failure to seek a change in venue amounted to ineffective assistance of counsel, a petitioner must offer some basis on which to conclude that an impartial jury was not empaneled. *Van Winkle v. State*, 2016

9

Ark. 98, at 13, 486 S.W.3d 778, 788. Roberts has not done so, and therefore he has failed to demonstrate prejudice as required by the second prong of *Strickland. See id.*

## III. *Juror Bias*

For his third point on appeal, Roberts argues that he was denied his constitutional right to an impartial jury when jurors failed to disclose their actual bias during voir dire. He challenges the impartiality of jurors Dennie Wornick and Vickie Denton, both of whom averred during voir dire that they would be impartial. Appellant points to testimony from the postconviction hearing, some seventeen years after the trial, that Wornick believed "the law says" premeditated murder should result in imposition of the death penalty and that Denton was biased against Roberts because of pretrial publicity and her belief that Roberts should get the death penalty if found guilty. The circuit court found this claim procedurally barred, citing *Howard v. State*, 367 Ark. 18, 238 S.W.3d 24 (2006), and *Cigainero v. State*, 321 Ark. 533, 906 S.W.2d 282 (1995). Indeed, this court has held that Rule 37 does not provide a means to challenge the constitutionality of a judgment where the issue could have been raised in the trial court, and a defendant's remedy for alleged juror misconduct is to directly attack a verdict by requesting a new trial pursuant to Ark. Code Ann. § 16-89-130(c)(7). *See Howard, supra.* Although Roberts attempts to distinguish his case and argues that his claim of juror misconduct was not known until years later, we are not persuaded. Because claims of juror misconduct are not cognizable in this postconviction proceeding, we affirm on this point.

## IV. *Courtroom Atmosphere*

Under this point, Roberts argues that he was denied his constitutional right to a fair trial because the prejudicial courtroom atmosphere violated his right to due process. In addition, he argues that appellate counsel was ineffective in failing to protect his right to due process by not raising arguments on appeal regarding the prejudicial courtroom atmosphere and improper statements made by the prosecutor in closing argument.

The courtroom atmosphere was apparently tense[2] and included the victim's family members and others wearing buttons with her picture. However, the circuit court found that Roberts's "bare allegations" on this point could not sustain a finding that he was deprived of his fundamental right to a fair trial. In addition, the circuit court found that Roberts failed to meet his burden of demonstrating that counsel's performance was ineffective under *Strickland*. We see no clear error and affirm on this point.

V. *Responding to Prejudicial False Testimony*

Next, Roberts contends that trial counsel was ineffective for failing to reasonably respond to false testimony presented by the State regarding his earnings and driving record. Attorneys have a well-established duty to conduct reasonable records searches, including employment records and public criminal history. *Rompilla v. Beard*, 545 U.S. 374, 385–86 (2005). Here, Roberts alleges that his trial counsel's failure to investigate his criminal and financial history was objectively unreasonable.

---

[2] There were threats made, a defense attorney carried a gun, and security was heightened at the defense's request.

Regarding Roberts's earnings, his employer testified that Roberts was a carpenter's helper and did concrete finishing and operated equipment such as a small truck or backhoe. Roberts earned $11.50 an hour and time-and-a-half for any overtime, plus a bonus; he was making $50,000 a year. During closing argument, the prosecutor argued that "he's not the sharpest knife in the drawer, but he's sharp enough isn't he, to make $50,000 a year as a construction worker." At the postconviction hearing, Social Security records were introduced that showed that the salary figure was exaggerated. Nonetheless, the evidence showed that Roberts had steady gainful employment for several years preceding the murder. Even if Roberts could show deficient performance by his trial counsel, he could not show that there is a reasonable probability that the fact-finder's decision would have been different absent counsel's error on such a relatively minor point.

Regarding Roberts's driving record, the prosecution challenged the notion that Roberts could not conform his conduct to the requirements of the law by pointing out his satisfactory driving history. At trial, evidence was introduced of two speeding tickets, in 1996 and 1998, but in fact Roberts had eleven speeding violations and had nearly had his license taken away. However, in the nine years immediately preceding the murder, he received only four traffic citations—an average of less than one ticket every two years. As the State points out, the introduction of the evidence of the additional tickets may well have harmed Roberts's claim that he was incapable of conforming his conduct to the law because the jury could have concluded from the five-year gap between his two most recent

12

tickets and the next most recent ticket that Roberts had learned from the consequences of his previous actions and had, in fact, subsequently conformed his conduct.

Roberts cannot show prejudice from these alleged errors by trial counsel, and we affirm on this point.

## VI. *Failure to Present Mitigation Evidence*

For his sixth point on appeal, Roberts argues that his trial counsel was ineffective in failing to present mitigation evidence at the penalty phase. Specifically, he points to evidence presented at the postconviction hearing of abuse by Roberts's father, the severity of his near-death accident at age twelve, his schizophrenia and family history of mental illness, and the death of his nephew in the days leading up to the offense. The circuit court thoroughly analyzed the evidence presented at trial and the evidence postconviction counsel argued should have been presented, and under the *Strickland* standards, was not convinced that counsel's performance had been ineffective. Having carefully reviewed the record, we see no clear error in the trial court's finding and affirm on this point.

## VII. *Jury's Alleged Failure to Consider Mitigation Evidence*

On this point, Roberts argues that trial counsel and appellate counsel were ineffective for failing to challenge the jury's failure to consider mitigation evidence as shown by the jury forms. Roberts offered sixteen mitigating circumstances in Forms 2A, 2B, and 2C. The jury checked nine circumstances in Form 2A, signifying that all members of the jury agreed those probably existed, but it did not place a check by any of the remaining seven circumstances on Forms 2B or 2C. Form 2B was to be checked if one or

more members of the jury (but less than all) believed that the mitigating circumstance probably existed; Form 2C was to be checked if there was some evidence presented to support the circumstance but the jury unanimously agreed that it was insufficient to establish that the mitigating circumstance probably existed. Roberts argues that the jury failed to properly consider the mitigating circumstances it did not check on any form,[3] which is critical because the jury was obligated to weigh the aggravating circumstance found unanimously to exist beyond a reasonable doubt against "any mitigating circumstances found by any juror to exist." The circuit court denied relief on the basis that the issue had been reviewed on direct appeal. Indeed, in *Roberts I*, this court specifically addressed the completion of the jury forms on mitigating circumstances and held that there was "no error." *Roberts I*, 352 Ark. at 511, 102 S.W.3d at 497. We affirm on this point because the trial court did not clearly err in determining that this issue could not be relitigated. *See Kemp v. State*, 348 Ark. 750, 765, 74 S.W.3d 224, 232 (2002) ("Rule 37 does not allow appellant to reargue points decided on direct appeal.").

VIII. *Ineligibility for Death Penalty Due to Intellectual Disability*

---

[3] These circumstances are as follows: the capital murder was committed while Roberts was under extreme mental or emotional disturbance; the capital murder was committed while the capacity of Roberts to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect and/or alcohol intoxication; Roberts, although legally responsible, suffers from an intellectual deficit; as a result of Roberts's brain damage, his ability to control his emotions and/or impulses have been impaired; as a result of Roberts's brain damage, his ability to accurately interpret social cues and communications from other persons has been impaired; Roberts exhibited remorse when interviewed by law enforcement officers about the disappearance of Andria Brewer; and Roberts cooperated with the investigation by leading law enforcement officers to the crime scene and to the body of Andria Brewer.

14

Roberts argues that he is categorically ineligible for the death penalty under the Eighth Amendment and Arkansas law because he is intellectually disabled, citing *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002) (forbidding imposition of the death penalty on persons who are "mentally retarded"), and Arkansas Code Annotated section 5-4-618 (Supp. 2019). Section 5-4-618(b) provides that "[n]o defendant with intellectual disabilities at the time of committing capital murder shall be sentenced to death."[4] Roberts contends that his death sentence should be vacated because he proved that he met the criteria for intellectual disability at the time of the offense. Before trial, Roberts filed a motion for a hearing to determine whether the State could seek the death penalty, citing Ark. Code Ann. section 5-4-618(b) and raising the issue of intellectual disability. The circuit court held a hearing that included expert testimony from Dr. Charles Mallory of the Arkansas State Hospital and found that Roberts was "subject to the death penalty." In this court's mandatory review of the record on direct appeal, we found no reversible error. In the order denying postconviction relief, the circuit court recognized that Roberts offered the testimony of neuropsychologist Dr. Andrews that Roberts was mildly intellectually disabled in 1999. However, the court found that the issue of Roberts's competency at the time of the offense had been settled on direct appeal and could not be reargued in postconviction proceedings. We affirm on this point.

IX. *Ineligibility for Death Penalty Due to Severe Mental Illness*

---

[4] At the time of Roberts's trial, before Act 1035 of 2019, the statute used the term "mental retardation" rather than "intellectual disabilities." *See* Act of Apr. 16, 2019, No. 1035, 2019 Ark. Acts ____.

15

Finally, Roberts argues that the Eighth Amendment of the United States Constitution, and the corresponding provision in article 2, section 9 of the Arkansas Constitution, prohibit his execution because he is severely mentally ill. He contends that this court should vacate his death sentence because of his undisputed traumatic brain injury and schizophrenia. However, there is currently no categorical prohibition on sentencing a person with schizophrenia to the death penalty. Roberts urges this court to extend *Roper v. Simmons*, 543 U.S. 551 (2005) (forbidding imposition of the death penalty on offenders who were under the age of eighteen when their crimes were committed), and *Atkins v. Virginia*, *supra*, to categorically prohibit the execution of the mentally ill. He argues that the same rationale that motivated the Supreme Court to outlaw the execution of juvenile offenders and the intellectually disabled should prohibit the execution of persons with serious mental illnesses. We decline Roberts's invitation to hold at this time that he may not be executed under the federal and state constitutions due to his schizophrenia and traumatic brain injury. We note that the law prohibits the execution of the "insane," *see Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595 (1986), and *Panetti v. Quarterman*, 551 U.S. 930, 127 S. Ct. 2842 (2007), but this court has held that a petitioner's claim of incompetency to be executed is not ripe when no date had been set for his execution. *Isom v. State*, 2015 Ark. 219, 462 S.W.3d 638 (citing *Nooner v. State*, 2014 Ark. 296, 438 S.W.3d 233). Accordingly, we affirm on this point.

X. *Conclusion*

16

We find no clear error in the circuit court's order denying Rule 37 relief, and we affirm.

Affirmed.

Hart, J., dissents.

**JOSEPHINE LINKER HART, Justice, dissenting.** I dissent. The defendant, Karl Roberts (Roberts), was not competent to stand trial at the time of his prosecution in 1999. The constitution prohibits the criminal prosecution of a defendant who is not competent to stand trial, and competence requires the ability to assist effectively in his or her own defense. *See, e.g., Newman v. State*, 2014 Ark. 7. The fact that Roberts was incompetent to stand trial, standing alone, compels that his conviction be vacated under Rule 37, without regard to the reasonableness of his trial counsel's representation. *See* Ark. R. Crim. P. 37(a)(i) (providing for relief where "the sentence was imposed in violation of the Constitution and laws of the United States or this state"); *Cothren v. State*, 344 Ark. 697, 704, 42 S.W.3d 543, 547–48 (2001) ("A petitioner may also qualify for Rule 37 relief, regardless of trial counsel's performance, if he demonstrates error so fundamental as to render the judgment of conviction void and subject to collateral attack.").

The facts of this case are tragic and undisputed. Roberts raped and killed Andria Brewer, known by those close to her as Andi, when she was just twelve years old. Without doubt, Andi's death was and is a painful loss for her family and her community. However, it is also undisputed that Roberts is sick. He suffers from schizophrenia. His diagnosis is contributed to and exacerbated by structural damage to the integrity of Roberts's brain. As

17

a child, 15 percent of Roberts's brain was destroyed when a dump truck ran over him and left him in a coma. As this court acknowledged in *Roberts VI*, the evidence of Roberts's schizophrenia and reduced cognitive state is "undeniable." 2016 Ark. 118, at 8, 488 S.W.3d 524, 529.

All the evidence presented below supports the conclusion that Roberts was incompetent both at the time of the crime and for purposes of standing trial. Much of the litigation in this matter has revolved around the past opinions of two experts, Dr. Mallory and Dr. Wetherby, who examined Roberts before trial in 1999 and concluded he was competent to stand trial, though both acknowledged reservations in their opinions. Importantly, those opinions have since been dispelled. The clinical assessments that formed the basis for those two opinions were incorrectly scored and incompletely administered.

Both doctors administered the Georgia Competency Test (GCT), and both doctors mishandled the questions designed to assess whether the subject can assist his attorneys in his defense. As an example, Dr. Mallory noted at the pretrial competency hearing that "if someone were to lie about him in court, . . . he would tell his lawyer," but on the GCT, Roberts actually said he would "call them a liar out loud" and "I couldn't control myself." Moreover, Dr. Mallory entirely failed to administer the portion of the test meant to identify psychosis. Similarly, Dr. Wetherby gave Roberts a passing score (at least "20") on the competency test she administered, but the evidence presented below indicates that Roberts actually scored only a 17 or an 18—a failing score that would have indicated

18

Roberts was incompetent to stand trial. These incorrect and incomplete evaluations were what Dr. Mallory and Dr. Wetherby based their opinions on in determining that Roberts was competent to stand trial. At the hearing below, the State presented no evidence of its own to contradict the assertion that these errors did, in fact, occur.

Roberts's postconviction attorneys demonstrated below both that these errors occurred and that they were material. Had the assessments been properly performed before the first trial, the results would have shown that Roberts was incompetent. There is no other evidence to suggest Roberts was competent; instead, all the evidence—including detailed testimony by forensic experts, illustrative accounts from Roberts's family and acquaintances about his life, and the difficulties explained by Roberts's trial attorneys themselves—supports that Roberts suffered a psychotic break and was unable to assist his trial attorneys in his defense. All this information is now in the record, and none of it is refuted by the State, nor is that lack of contrary evidence addressed by the majority.

In short, Roberts's postconviction attorneys established that his cognitive state was so reduced by disease and trauma that he could not assist his trial attorneys in preparing and presenting his defense—manifesting all the way up to and specifically including the trial itself. The evidence presented at the postconviction hearing to show Roberts's incompetence was overwhelming and uncontroverted in all material respects—including the salient errors by the experts who examined Roberts before trial.

In its order denying Roberts's petition, the lower court acknowledged the problems with the original competence evaluations, but never assessed the significance of those

19

problems. Instead, the lower court simply opined that Roberts's postconviction attorneys failed to meet their burden of proof:

> [Petitioner argues that the earlier] determination that Petitioner was competent to stand trial was "based on incomplete administration and incorrect scoring of the Georgia Competency Test.["] <u>In other words, according to Petitioner the trial court and the Supreme Court got it wrong in 1999 and 2003.</u>
> ...
> Petitioner has <u>failed to overcome the finding</u> that Petitioner was not competent [sic] at the time of his trial. In sum, Petitioner has not demonstrated that his current mental condition equates with his condition at the time of trial in 1999.

R. 847-50 (underlines added). The lower court declined to actually address how the incorrectness of the assessments that supplied the basis for that original "finding" would impact the analysis. To affirm that holding, the majority essentially does the same:

> Here, the issue of Roberts's competency to stand trial was litigated before the trial court prior to trial, and he was found to be competent. At the postconviction hearing Roberts's counsel presented evidence that the competency testing was flawed. In the order denying Rule 37 relief, the court found that Roberts had not overcome the previous finding of competency and that "Petitioner has not demonstrated that his current mental condition equates with his condition at the time of trial in 1999." We cannot say that the trial court's denial of relief on this point is clearly erroneous, and we thus affirm.

(Maj. Op. at 8). With all due respect to the majority, I disagree.

As did the lower court's order, the majority opinion fails to acknowledge the significance of what appears to be uncontroverted fact: (1) the assessments that formed the basis for the original opinions regarding Roberts's competence were not properly performed; (2) had those assessments been administered completely and scored correctly,

20

the results would have shown that Roberts could not assist his attorneys and was incompetent to stand trial; and (3) the deference that has since been afforded to those opinions was therefore misplaced. Despite the offhand remarks contained in the lower court's order, this was *exactly* the point Roberts's postconviction attorneys were making, i.e., the courts that have previously addressed this issue *did* get it wrong because they were relying on incorrect information. Moreover, Roberts's postconviction attorneys have established this point in spades, and the State has presented nothing to rebut it. Accordingly, the lower court's decision on this point is clearly erroneous, and it should be reversed. In *Roberts VI*, this court explained, "Despite our belief that the trial court is in the best position to assess credibility and weigh the evidence, in this case we are left with a firm conviction that a mistake has been made." 2016 Ark. 118, at 8. This court should do so again here, as there is simply nothing to "compel an alternative conclusion." *Id.*

By our law and our constitution, individuals situated as Roberts was at the time of his prosecution are incompetent to stand trial, and when it is determined that such an individual was tried and convicted despite his incompetence, that conviction violates due process and must be vacated. *See* Ark. Code Ann. § 5-2-302(a) ("No person who lacks the capacity to understand a proceeding against him or her or to assist effectively in his or her own defense as a result of mental disease or defect shall be tried, convicted, or sentenced for the commission of an offense so long as the incapacity endures[.]"); *Pate v. Robinson*, 383 U.S. 375, 387 (1966) ("If the State elects to retry Robinson, it will of course be open to him to raise the question of his competence to stand trial at that time and to request a

21

special hearing thereon. In the event a sufficient doubt exists as to his present competence such a hearing must be held. If found competent to stand trial, Robinson would have the usual defenses available to an accused."). Accordingly, while I would also hold that Roberts's trial attorneys were deficient for failing to develop a defense for mental disease (and other related errors), those questions need not be addressed in this case. Roberts's incompetence at the time of trial, standing alone, is dispositive.

I dissent.

*Lisa G. Peters*, Federal Defender, by: *Scott W. Braden*, for appellant.
*Leslie Rutledge*, Att'y Gen., by: *Jason Michael Johnson*, Ass't Att'y Gen., for appellee.