# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1935
_____

Karl Roberts

*Plaintiff - Appellant*

v.

Dexter Payne

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Eastern District of Arkansas
_____

Submitted: December 12, 2023
Filed: August 19, 2024
_____

Before GRUENDER, GRASZ, and KOBES, Circuit Judges.
_____

GRASZ, Circuit Judge.

In 2000, Karl Roberts was tried, convicted, and sentenced to death in Arkansas state court for the rape and murder of his twelve-year-old niece. Roberts waived his right to challenge his conviction on direct appeal, in state postconviction proceedings, and in federal habeas corpus proceedings. The Arkansas state trial court found the waiver to be knowing and voluntary. The Arkansas Supreme Court

also found Roberts's waiver to be valid, and it upheld his conviction and death sentence. *See Roberts v. State*, 102 S.W.3d 482, 485 (Ark. 2003) (*Roberts I*).

On the day of his scheduled execution in 2004, Roberts moved for a stay of execution in a federal district court, which was granted. A few months later, Roberts filed his petition for writ of habeas corpus in federal district court. This began two decades of litigation alternating between state and federal courts.

By 2022, a federal district court denied Roberts's nineteen habeas corpus claims, but it granted a certificate of appealability (CoA) on three claims: whether Roberts was (1) intellectually disabled, (2) competent to be tried, and (3) competent to waive his direct appeal.[1] This court then expanded Roberts's CoA to include two ineffective assistance of counsel claims: whether counsel was ineffective for (1) failing to properly investigate and challenge Roberts's competency to be tried and (2) failing to investigate and present evidence of Roberts's mental health as mitigating evidence at sentencing. For the reasons below, we affirm the district court and deny Roberts's petition for writ of habeas corpus.

## I. Background

### A. The Murder Trial

In 1999, after police questioning, Roberts confessed he took his twelve-year-old niece, Andria Brewer, from her home, drove her to a secluded location, raped her, and strangled her to death. After this horrific rape and murder, Roberts threw Andria's clothes in a creek and covered her body with dead tree limbs. Roberts

---

[1]The CoA as to the first two claims was granted by the then presiding judge, the Honorable Richard G. Kopf, United States District Judge for the District of Nebraska, sitting by designation. The CoA as to the third claim was granted by the Honorable James M. Moody, Jr., United States District Judge for the Eastern District of Arkansas.

admitted he killed Andria to keep her from identifying him to police. Following his confession, Roberts led investigators to the location of Andria's body.

During Roberts's trial in Arkansas state trial court, Roberts attempted to persuade the jury he did not have the requisite mental state for murder. He presented evidence that he was run over by a dump truck when he was twelve, causing damage to the frontal and temporal lobes of his brain. The defense presented testimony from Dr. Lee Archer, a neurologist, and Dr. Mary Wetherby, a neuropsychologist. Both defense experts testified Roberts had impulse and behavioral control problems due to his brain injury. Dr. Archer opined that "if it were not for the injury that Karl Roberts sustained in 1980, he would not have committed this alleged crime."

In contrast, the State presented testimony from Dr. Reginald Rutherford, a clinical neurologist, and Dr. Charles Mallory, a psychologist. They opined that while Roberts's intelligence quotient (IQ) score of 76 put him on the borderline range of intellectual functioning, his abilities had no "substantial impairment in any occupational or social arena of life." Indeed, Roberts completed high school, worked at the same construction job for six years, was married for ten years, and has two children. Dr. Mallory opined Roberts has "the capacity to appreciate the criminality of his conduct" because "he took steps to avoid apprehension" both before and after the crime—he selected a time in which Andria would be home alone, drove her to a remote location to rape her with no witnesses, and then killed her because he did not want her to report the rape. Dr. Rutherford agreed Roberts "was involved in a fairly complex series of actions and it's clear that he appreciated the circumstances that he was engaged in . . . . [H]e tried to cover up what he did."

After the trial, the jury convicted Roberts of capital murder. During sentencing, the jury found one aggravating circumstance—that the murder was committed in an especially cruel or depraved manner—outweighed the mitigating circumstances, and sentenced Roberts to death.

## B.  Arkansas State Court Waivers

Direct Appeal Waiver: In July 2000, two months after his conviction, Roberts—who was represented by counsel—waived his rights to challenge his conviction on direct appeal to the Arkansas Supreme Court.  During this proceeding, the trial judge asked Roberts a series of questions about whether he understood what it meant to waive his rights to appeal.  Roberts reaffirmed he understood all his appeal rights and had fully discussed the waiver with his attorneys.  The trial judge asked Roberts to tell him in his own words what he was asking for, and Roberts stated: "I want to die."  The trial judge then clarified with Roberts whether he was asking for the death sentence to be carried out without any further action by his attorney on direct appeal.  Roberts answered, "Yes."  The trial court subsequently found "Roberts has knowingly and intelligently waived his right to [direct] appeal." In April 2003, during an automatic and mandatory review of the entire record, the Arkansas Supreme Court affirmed that the trial court did not clearly err in determining "Roberts knowingly and intelligently waived his rights of [direct] appeal." *See Roberts I*, 102 S.W.3d at 488.

Postconviction Waiver: The following month, in May 2003, Roberts attended a hearing in Polk County Circuit Court pursuant to Arkansas Rule of Criminal Procedure 37.5, the Special Rule for Persons Under Sentence of Death.  *See State v. Roberts*, 123 S.W.3d 881, 882 (2003) (*Roberts II*).  During this hearing, Roberts appeared pro se and indicated he did not want to have an attorney appointed to represent him during postconviction relief matters. *Id.*  Roberts stated, "I don't think a guilty person should be allowed to live or he should at least be able to accept responsibility, his punishment whatever it may be." *Id.*  When the court asked whether Roberts understood he was choosing death over life, Roberts answered, "Yes, sir." *Id.*  After a series of follow up questions, the court found Roberts had sufficiently waived his right to appointment of counsel and his right to seek postconviction relief. *See id.* at 882–83.  In October 2003, the Arkansas Supreme Court affirmed the circuit court's findings. *See id* at 883.

## C. Federal Habeas Corpus Proceedings

On January 6, 2004, the day of Roberts's scheduled execution, Roberts moved for and was granted a stay of execution by a federal district court. *See Roberts v. Norris*, 415 F.3d 816, 818 (8th Cir. 2005). On July 16, 2004, Roberts petitioned for a writ of habeas corpus with the federal district court. *See id.*

In 2007, the district court issued a "stay and abey" order, directing Roberts to seek relief in state court under Arkansas Rule 37.5 regarding all unexhausted claims. *Roberts v. Norris*, 526 F. Supp. 2d 926, 949 (E.D. Ark. 2007). "In short, Roberts will be given an opportunity to convince the state courts that he did not competently waive his right to appeal and to seek state post-conviction relief." *Id.*; *see also id.* at 928 n.2 (staying the federal action "to avoid a statute of limitations problem" under 28 U.S.C. § 2244(d)(1)–(2)).

## D. Arkansas Rule 37.5 Petition

Thereafter, this case oscillated between Arkansas state courts for over ten years. In 2016, the Arkansas Supreme Court ultimately held "the [Arkansas] circuit court erred when it found that Roberts has the capacity to choose between life and death and could make a knowing and intelligent waiver" because it was "undeniable that Roberts suffers from schizophrenia." *Roberts v. State*, 488 S.W.3d 524, 526, 529 (Ark. 2016) (*Roberts III*). Thus, the Arkansas Supreme Court reopened Roberts's Rule 37.5 proceedings and allowed him to file a new petition for postconviction relief. *See id.* at 529. In his renewed petition, Roberts asserted eighteen claims for postconviction relief. *See Roberts v. State*, 592 S.W.3d 675, 679 (Ark. 2020) (*Roberts IV*).

The Arkansas circuit court held a three-day evidentiary hearing. One of Roberts's expert witnesses, Dr. Daryl Fujii, attested to Roberts's schizophrenia and its impact on his ability to assist his counsel in his own defense and to conform his conduct to the law. Dr. Fujii also identified what he believed to be errors prior

defense experts, Dr. Mallory and Dr. Wetherby, made in their competency assessments. The circuit court heard from people who knew Roberts prior to his dump truck accident. These individuals testified that Roberts became more distant and quicker to anger after his accident. Ultimately, the circuit court denied relief on every claim, and the Arkansas Supreme Court affirmed the decision in January 2020. *See Roberts IV*, 592 S.W.3d at 685.

## E. Return to Federal Court

In October 2020, Roberts filed an amended federal habeas corpus petition, raising nineteen claims of constitutional error. About one year later, the district court entered an order denying Roberts's petition in its entirety, but granting Roberts's CoA on two claims. In 2022, the district court granted a CoA for one more claim. This court then expanded Roberts's CoA to include two ineffective assistance of counsel claims.

Five issues are now before this court: whether (1) Roberts is intellectually disabled, (2) Roberts was competent to stand trial, (3) Roberts was competent to waive his direct appeal, (4) trial counsel was ineffective in investigating Roberts's competency to be tried, and (5) trial counsel was ineffective in investigating Roberts's mental health as mitigation evidence. We address each in turn.

## II. Discussion

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law." *Harrington v. Richter*, 562 U.S. 86, 91 (2011). "In general, if a convicted state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." *Trevino v. Thaler*, 569 U.S. 413, 421 (2013).

When reviewing habeas corpus appeals, this court reviews the district court's legal conclusions de novo, the factual findings for clear error, and defers "to a state court's findings of fact if they are fairly supported by the record." *Wilkins v. Bowersox*, 145 F.3d 1006, 1011 (8th Cir. 1998). Because of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), codified in 28 U.S.C. § 2254, we give great deference to the factual findings made by the state court.

Specifically, AEDPA restricts a federal court's power to grant habeas relief in two ways. First, AEDPA "provides that if a claim was adjudicated on the merits in state court, a federal court cannot grant relief unless the state court (1) contradicted or unreasonably applied [Supreme Court] precedents, or (2) handed down a decision 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Shoop v. Twyford*, 596 U.S. 811, 818–19 (2022) (quoting § 2254(d)). This means "[t]he question under AEDPA is . . . not whether a federal court believes the state court's determination was incorrect, but whether that determination was unreasonable . . . ." *Id.* at 819. This is "'a substantially higher threshold' for a prisoner to meet." *Id.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

Second, AEDPA prevents a federal court from developing or considering new evidence outside of state court proceedings. *Id.* This ensures that the "state trial on the merits is the main event . . . rather than a tryout . . . for what will later be the determinative federal habeas hearing." *Id.* (internal quotation marks omitted); *see also* § 2254(e)(2). There are two limited exceptions to this rule if a prisoner "failed to develop the factual basis of a claim in State court proceedings": first, if the claim relies on a "new" and "previously unavailable" "rule of constitutional law" made retroactively applicable by the Supreme Court; or second, if the claim relies on "a factual predicate that could not have been previously discovered through the exercise of due diligence." *Id.* (quoting § 2254(e)(2)).

## A. Intellectual Disability Claim

The district court below applied the deferential standard of review under AEDPA and rejected Roberts's claim that he was intellectually disabled, concluding "Roberts has not rebutted the presumption of actual correctness in *Roberts I* regarding intellectual disability by clear and convincing evidence." We agree.

Roberts's claim is grounded in the Eighth Amendment's prohibition of "cruel and unusual punishments" because the execution of an individual with an intellectual disability is a cruel and unusual punishment prohibited by the Eighth Amendment. *Atkins v. Virginia,* 536 U.S. 304, 321 (2002).

The review on whether a defendant is intellectually disabled—and thus, spared from execution—belongs in the first instance to the states. *See Hall v. Florida*, 572 U.S. 701, 719 (2014). Accordingly, states have "the task of developing appropriate ways to enforce" the constitutional restriction on executing the intellectually disabled. *Id.* (internal quotation marks omitted). While states' statutory definitions of intellectual disability are not identical, they must "generally conform to the clinical definitions," *id.* (quoting *Atkins*, 536 U.S. at 317 n.22), and be "informed by the medical community's diagnostic framework." *Id.* at 721.

Under Arkansas law, intellectual disability is defined as follows:

(A) Significantly below-average general intellectual functioning accompanied by a significant deficit or impairment in adaptive functioning manifest in the developmental period, but no later than eighteen (18) years of age; and

(B) A deficit in adaptive behavior.

Ark. Code Ann. § 5-4-618(a)(1). "[T]he Arkansas Supreme Court has consistently construed its state's statutory right to be concurrent with the federal constitutional right established in *Atkins*." *Sasser v. Hobbs*, 735 F.3d 833, 842 (8th Cir. 2013).

"Arkansas places the burden of proving [intellectual disability] 'by a preponderance of the evidence' on the defendant.'" *Id.* at 843 (quoting Ark. Code Ann. § 5-4-618(c)). To meet this burden, the defendant must prove: (1) the defendant has significant below-average general intellectual functioning; (2) the defendant has significant deficit or impairment in adaptive functioning; (3) both of the above manifested before age eighteen; and (4) the defendant has a deficit in adaptive behavior. *Id.*; Ark. Code Ann § 5-4-618(a)(1).

Though AEDPA generally restricts a federal habeas court from developing or considering new evidence outside of state court proceedings, *see Shoop*, 596 U.S. at 819; § 2254(e)(2), we must consider whether an exception applies. If the habeas claim relies on a "new" and "previously unavailable" rule of constitutional law made retroactively applicable by the Supreme Court, then the federal court may consider new evidence outside of state proceedings. *Id.* Here, Roberts's trial occurred before the 2002 *Atkins* decision created a new constitutional right forbidding the execution of the intellectually disabled. *See Atkins*, 536 U.S. at 321. Therefore, we must first address the question of whether Roberts's habeas claim relies on a "new" and "previously unavailable" rule of constitutional law. If so, then we can consider new evidence outside of state court proceedings.

Roberts argues our decision in *Simpson v. Norris*, 490 F.3d 1029 (8th Cir. 2007) is controlling here, but we disagree with this characterization. In *Simpson*, we held that the prisoner did not procedurally default his *Atkins* claim, even when the prisoner "did not present a mental retardation defense to the death penalty (a defense available to him under [Arkansas] law)." *See id.* at 1034. Notably, we reasoned that "the availability of a similar claim under Arkansas law is irrelevant to our consideration here: [the prisoner] is raising a previously unavailable federal claim, and that claim is separate and distinct." *Id.* at 1035. The facts here differ. The prisoner in *Simpson* never litigated the issue of his intellectual disability until he reached federal courts. Here, Roberts litigated his intellectual disability claim in state court and received a decision on the matter, without a procedural default issue.

Under these facts, *Atkins* did not provide a "previously unavailable federal claim," as Roberts's prior hearings were substantively akin to a federal *Atkins* hearing.

The facts in this case are much closer to *Conaway v. Polk*, 453 F.3d 567 (4th Cir. 2006), where our sister circuit decided a similar issue. In *Conaway*, the Fourth Circuit held that a state court decided "the dispositive issue in the *Atkins* claim" when, before *Atkins* was decided, the state court determined that a defendant was not intellectually disabled under North Carolina law. *See id.* at 592. The Fourth Circuit noted a state court ruling that does not cite the relevant Supreme Court precedent could still reach the "merits" of that precedent for purposes of AEDPA. *Id.* (citing *Early v. Packer*, 537 U.S. 3, 7–8 (2002)). Therefore, the state court's statutory decision constituted an adjudication of the *Atkins* claim "on the merits" for purposes of AEDPA review. *Id.*

We agree with our sister circuit's approach in *Conaway*. AEDPA requires a federal court to give "deference to the state court's determination," so "a habeas petitioner challenging a state conviction must first attempt to present his claim in state court," *Harrington*, 562 U.S. at 103–04, because "a federal habeas court may *never* needlessly prolong a habeas case, particularly given the essential need to promote the finality of state convictions," *Shinn v. Ramirez*, 596 U.S. 366, 390 (2022) (cleaned up), nor should a federal court "disturb the 'State's significant interest in repose for concluded litigation.'" *Shoop*, 596 U.S. at 820 (quoting *Harrington*, 562 U.S. at 103).

Hence, we stay true to AEDPA's intent and prioritize Arkansas's significant interest in adjudicating this habeas litigation. Because Arkansas courts have already heard extensive evidence regarding Roberts's alleged intellectual disability, we hold they have already decided the merits of Roberts's intellectual disability claim when they determined he was not intellectually disabled under Arkansas law, even if that determination occurred prior to the *Atkins* decision. *See Packer*, 537 U.S. at 7–8 (upholding state court's decision when prisoner's habeas claim was "the same claim rejected *on the merits* in his direct appeal" (emphasis added)). Therefore, the

-10-

Arkansas courts' decisions constituted an adjudication of the *Atkins* claim "on the merits" for purposes of AEDPA, and we accordingly apply AEDPA deference to their findings. *See id.* Applying that deference, we affirm the district court's dismissal of Roberts's *Atkins* claim.

Ample proof supports the reasonableness of the Arkansas Supreme Court's rejection of Roberts's intellectual disability claim. Most notably, Roberts's 76 IQ score is six points above the recognized intellectually-disabled threshold of 70 IQ points. Even accounting for the standard error of measurement of plus-or-minus 5 IQ points, Roberts's IQ score is, at worst, 71, which is still above the range for intellectual disability. *See Jackson v. Payne*, 9 F.4th 646, 654 (8th Cir. 2021) (noting a generally applicable standard error of measurement is plus-or-minus 5 IQ points). Additionally, Dr. Rutherford testified that Roberts's "major life activities" were not affected by his intelligence level and highlighted that Roberts "completed high school, he was successful in employment, [and] he was married for 10 years[.]"

And because nothing in the Arkansas courts' adjudication "(1) resulted in a decision that was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254 (d)(1)-(2), we cannot disturb their decisions.

## B. Roberts's Competency to be Tried

The district court, applying AEDPA deference, rejected Roberts's claim that he was incompetent to be tried. Roberts argues this was error. We agree with the district court.

The Due Process Clause of the Fourteenth Amendment prohibits states from prosecuting defendants who are not competent to stand trial. *Medina v. California*, 505 U.S. 437, 439 (1992). To be competent to stand trial, a defendant must have

"the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense . . . ." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). Competence to stand trial is a factual issue, so we presume the state court's finding of competence is correct. *Lyons v. Luebbers*, 403 F.3d 585, 593 (8th Cir. 2005); *Reynolds v. Norris*, 86 F.3d 796, 800 (8th Cir. 1996) ("On habeas review of a substantive competency claim, this court generally presumes that a state court's factual finding of competency is correct.").

The Arkansas courts' competency findings are reasonably supported by the record. Before Roberts's trial, Dr. Mallory evaluated Roberts at the Arkansas State Hospital and determined he was competent to stand trial. The examination process was extensive—it included four days of observation by nursing staff in an inpatient ward, eight hours of in-person interviews and examinations with medical professionals, and reviews of his entire medical history since 1980. Roberts was "alert and cooperative" during his interviews, and denied symptoms of psychosis during open-ended questioning, and specifically denied having altered states of thought, uncontrollable behavior, or seizures.

Of course, the doctors did not just take Roberts at his word. Rather, they conducted an extensive examination process which included the administration of the following three psychological tests.

    (i)    <u>Wechsler Adult Intelligence Scale-III</u>: This is "a measure of general cognitive skills and efficiency." This test showed Roberts to have below average general intellectual skills, but the report noted "his intellectual handicap has not affected any of his major life activities."

    (ii)    <u>Minnesota Multiphasic Personality Inventory-2 (MMPI-2)</u>: This is "a self-report, true-false inventory of items that assess attitudes, problems, and personality styles of individuals[.]" Roberts's answers "would suggest bizarre thinking and experiences, depressed mood, anxiety and social avoidance." But the examiner considered Roberts's results invalid because

"he appeared to over-report psychological problems and over-endorse personal virtues."

(iii) <u>Georgia Court Competency Test</u>: This is "a structured interview that assesses a defendant's understanding of the trial process and issues related to his own defense." Roberts's response indicated "he understood the roles of various court personnel," and "he had the capacity to relate to his attorney in a rational manner." He also "understood the nature of his charges and could appreciate their seriousness," and "had the capacity to understand the range of possible verdicts and the consequences of conviction." A score greater than 70 on this test is passing. Roberts scored 90 out of 100.

The state court considered the evidence and extensive testing in each instance and concluded (1) Roberts was competent to stand trial and to assist his attorneys, and (2) Roberts has not demonstrated his later mental condition equates with his condition at the time of trial. *Roberts IV*, 592 S.W.3d at 681. Based on the assortment of intellectual functioning tests and expert testimony at the time of trial, we see no reason to disturb the Arkansas courts' repeated findings that Roberts was competent for trial.[2]

## C. Roberts's Competency to Waive Direct Appeal

On Roberts's claim he was not competent to waive his appeal rights, the district court concluded "AEDPA deference requires the denial of this claim." We agree.

---

[2]Roberts relies on Dr. Fujii's later opinion to argue that Dr. Mallory erroneously discarded the results of his MMPI-2 test, which Dr. Fujii believed supported a diagnosis of schizophrenia. But this is insufficient to overcome AEDPA's deferential standard of review—Roberts's competency to stand trial was adjudicated at least three times in state court: in a pretrial motion, on direct appeal, and during Rule 37.5 proceedings. The findings made in those adjudications were not unreasonable, and therefore we defer to the state court's rulings. *See* § 2254(e)(1).

As with competency to stand trial, a state court's conclusion regarding a defendant's competency to waive appeal rights is generally entitled to the "presumption of correctness." *O'Rourke v. Endell*, 153 F.3d 560, 567 (8th Cir. 1998). Here, after extensive questioning, the Arkansas trial court found Roberts competent to make a knowing and voluntary waiver of his right to appeal. On direct appeal,[3] the Arkansas Supreme Court discussed and analyzed Roberts's competency to waive his appeal and concluded "the trial court did not clearly err in determining Roberts knowingly and intelligently waived his rights of appeal." *Roberts I*, 102 S.W.3d at 487.

Roberts argues his case is comparable to *O'Rourke v. Endell*, when we concluded the state court record failed to "demonstrate that [the petitioner] appreciated the consequences of his decision to waive his Rule 37 appeal." 153 F.3d at 568 (internal quotation marks omitted). But *O'Rourke* is distinguishable from Roberts's case in several ways.

In *O'Rourke*, we found a postconviction waiver inadequate for two predominant reasons. First, the state court failed to appoint a representative for O'Rourke, depriving him of due process. *See id.* at 569. This was not the case

---

[3]A decade after *Roberts I*, in 2013, the Arkansas Supreme Court found Roberts unable to knowingly and intelligently waive postconviction proceedings. But this does not render its 2003 decision unreasonable. In 2013, the Arkansas Supreme Court concluded that, at time of trial, Roberts was suffering from schizophrenia that rendered him "incapable of choosing between life and death or knowingly and voluntarily waiving his postconviction rights." *Roberts III*, 488 S.W.3d at 528. This is a non-contemporaneous schizophrenia finding, which does not demonstrate Roberts was unable to waive his appeal rights following his trial, more than a decade ago. *See Roberts I*, 102 S.W.3d at 487 (deferring to the trial judge because "the trial judge had the benefit of having heard much psychological evidence during the pretrial competency hearing and throughout the course of the trial"); *see also Weisberg v. Minnesota*, 29 F.3d 1271, 1278 (8th Cir. 1994) (stating "[r]etrospective determinations" of competency are "strongly disfavored" and have "inherent difficulties even under the "most favorable circumstances" (internal quotation marks omitted)).

-14-

here—unlike the unrepresented petitioner in *O'Rourke*, Roberts was represented by counsel. Specifically, Roberts confirmed he waived his appeal rights after his counsel advised him that he "would be able to proceed under Arkansas Rules of Criminal Procedure 37.5 and allege any errors or ineffective assistance."

*O'Rourke* was different for a second reason. The record reflected the petitioner in O'Rourke did not understand "the significance and consequences" of his decision to waive his appeal. *Id.* at 568. Notably, O'Rourke said he wanted "to be executed," and that statement "falls far short of demonstrating that he fully understood the consequences" because "[t]he court never explained to O'Rourke the significance of his decision to waive" and "[n]o one questioned him as to his understanding of the possible results of a successful appeal, which might have included not only a lesser sentence but a new trial with a potentially different outcome." *Id.*

As in *O'Rourke*, Roberts also stated his desire to die. *See id.* But unlike the court in *O'Rourke*, the Arkansas trial court thoroughly explained the significance of Roberts's decision to waive his appeal, asking multiple times whether Roberts understood his decision:

> BY THE COURT:
> Q: Do you know what the word "waiver" means?
> A: Yes.
> Q: Would you mind telling me?
> A: That means to let something pass.
> Q: You have the right to appeal your conviction and sentence to the Arkansas Supreme Court. A waiver of that appeal would mean that you would be giving up that right. Do you understand that?
> A: Yes.
> Q: Now, do you understand the difference between life and death?
> A: Yes.
> Q: Do you understand that if you do not have an appeal, that the judgment entered by the Court could be carried out?
> A: Yes.
> Q: What is that judgment?

A: Death.

Q: Do you understand that?

A: Yes.

Q: Are you sure?

A: Yes, I am.

Q: Now, I'm not trying to talk you into anything or change your mind or tell you what I think you should do. The purpose of these questions is to make sure that you understand what you're doing. Do you understand me?

A: Yes, sir.

. . . .

Q: I guess maybe I ought to go over this. Your waiver says that you have fully discussed with your attorneys. Did you discuss with [defense counsel] what we're talking about today?

A: Yes, we did.

Q: Did he tell you that you don't have to do this if you don't want to?

A: Yes.

Q: You can assert your right to any and all appeals provided by law.

A: Yes.

Q: Do you want to assert any of those appeals?

A: No.

Q: Are you positive?

A: Yes.

Q: Now, you said when you signed this waiver that you were not under the influence of any medication or receiving any medical treatment. Is that correct?

A: Yes, it is.

. . . .

Q: Do you understand my questions, what I'm asking you?

A: Yes, I do.

Q: Now, just tell me in your own words what your waiver is asking for and what you are asking for today.

A: I want to die.

Q: Are you telling me that you are asking that the death sentence be carried out?

A: Yes.

Q: It says here, without any further action by your attorney by way of direct appeal.

A: Yes.

-16-

The record here demonstrates Roberts was able to understand his position, and supports the finding that Roberts had the "capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation . . . ." *Rees v. Peyton*, 384 U.S. 312, 314 (1966).

## D. Ineffective Assistance of Counsel

Roberts claims ineffective assistance of trial counsel because the trial counsel failed to (1) properly investigate and challenge Roberts's competency to be tried during the guilt phrase of trial and (2) properly investigate and present Roberts's mental health as mitigating evidence during the sentencing phase of trial. The district court dismissed these claims, stating "[t]o be frank, it is not close." We agree with the district court.

An ineffective assistance of trial counsel claim is addressed under the two-part test from *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To grant relief based on a claim of ineffective assistance of counsel, we must find (1) counsel's performance was constitutionally ineffective (performance test) and (2) the ineffective performance resulted in prejudice (prejudice test)." *Kenley v. Armontrout*, 937 F.2d 1298, 1303 (8th Cir. 1991). To satisfy the performance test, the defendant must show "that counsel's performance fell below an objective standard of reasonableness." *Worthington v. Roper*, 631 F.3d 487, 498 (8th Cir. 2011). Courts presume "that counsel provided effective assistance," and "do not use hindsight to question counsel's performance." *Kenley*, 937 F.2d at 1303. To satisfy the prejudice test, the defendant must show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

A federal habeas court's review of a state court's application of *Strickland* is "doubly deferential" because it requires a "highly deferential look at counsel's performance through the deferential lens of [AEDPA]." *Bahtuoh v. Smith*, 855 F.3d 868, 872 (8th Cir. 2017) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011));

-17-

*accord Abernathy v. Hobbs*, 748 F.3d 813, 817 (8th Cir. 2014) ("Taking AEDPA and *Strickland* together establishes a 'doubly deferential' standard of review in § 2254 cases."). In other words, the doubly deferential standard "gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

Here, the Arkansas Supreme Court reasonably applied *Strickland* under both the performance and prejudice prongs. *See Roberts IV*, 592 S.W.3d at 680. Regarding the performance prong, Roberts argues only that it was unreasonable for counsel to investigate his brain injury caused by the dump-truck accident, without investigating whether he had schizophrenia or other mental-health issues. But we cannot "use hindsight to question counsel's performance," and Roberts was not diagnosed with schizophrenia at the time of his trial. *See Kenley*, 937 F.2d at 1303. Therefore, the Arkansas Supreme Court reasonably concluded "counsel cannot be considered ineffective for failing to investigate Roberts's schizophrenia when the four mental health professionals who testified at trial did not diagnose him as such." *Roberts IV*, 592 S.W.3d at 680–81. The Arkansas Supreme Court also reasonably affirmed the Arkansas circuit court's conclusion that counsel did not perform deficiently in its handling of mitigation evidence. *Roberts IV*, 592 S.W.3d at 683. Indeed, the jury found nine mitigating circumstances and still concluded the one aggravating circumstance—the cruel and depraved nature of the murder— outweighed any mitigating circumstance.

Furthermore, even if the counsel's performance was ineffective, Roberts was not prejudiced. During the sentencing phase of trial, the jury heard testimony that Roberts showed malice and calculation. According to Roberts's own admissions, he drove Andria to a secluded spot, murdered her to prevent being identified, tried to hide her body, and pretended to look for her to prevent arousing suspicion. Roberts failed to show how other evidence—such as his birth records, personal injuries, history of trauma, or turmoil over the death of his nephew—would have affected the jury's ultimate determination that Roberts's brutal murder deserved death. It follows "there is no prejudice when the new mitigating evidence 'would

-18-

barely have altered the sentencing profile presented' to the decisionmaker[.]" *Sears v. Upton*, 561 U.S. 945, 954 (2010) (quoting *Strickland*, 466 U.S. at 700).

### III. Conclusion

For the foregoing reasons, we reject Roberts's claims and affirm the denial of Roberts's habeas petition.

_____