# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-3526

_____

Roderick Leshun Rankin

*Plaintiff - Appellant*

v.

Dexter Payne, Director, Arkansas Department of Correction (originally named as
Ray Hobbs)

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: April 16, 2025
Filed: June 20, 2025

_____

Before LOKEN, GRUENDER, and GRASZ, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Roderick Rankin was sentenced to death in 1996 for the murders of Zena
Reynolds, Ernestine Halford, and Nathaniel Halford. In this federal habeas case,
Rankin contends that (1) he was intellectually disabled at the time of the murders,
(2) trial counsel was ineffective for failing to investigate and present evidence that

his now-deceased brother Rodney Rankin[1] committed the murders, (3) trial counsel labored under multiple conflicts of interest, (4) the penalty-phase jury instructions violated *Mills v. Maryland*, 486 U.S. 367 (1988) and *McKoy v. North Carolina*, 494 U.S. 433 (1990), and (5) trial counsel was ineffective for failing to object to the penalty-phase jury instructions. The district court[2] denied habeas relief without an evidentiary hearing, and we affirm.

## I.

In the early morning hours of December 27, 1994, Sonyae Reynolds was asleep at an apartment she shared with her sister Zena Reynolds, her two nephews, her mother Ernestine Halford, and her stepfather Nathaniel Halford. Zena was in the living room with her two children, while Sonyae, Ernestine, and Nathaniel were in their bedrooms. Shortly before 3:00 a.m., Sonyae awoke upon hearing the front door of the apartment break open. She immediately hid in her bedroom closet, from where she heard screaming and six gunshots. The shooter opened Sonyae's bedroom door, waited a little, and then ran away. After waiting about five minutes, Sonyae left her bedroom closet and found the slain bodies of Zena, Ernestine, and Nathaniel.[3] Each died from a contact gunshot wound to the head. Nathaniel had been shot twice in the head, and Ernestine had also been shot in the arm. Zena's two children were unharmed. Sonyae called 911 and told the 911 operator that she had only seen the shooter's back and could not identify him.

---

[1]We refer to the petitioner Roderick Rankin as "Rankin" and his brother Rodney Rankin as "Rodney."

[2]The Honorable James M. Moody Jr., United States District Judge for the Eastern District of Arkansas.

[3]The front door of the Halfords' apartment opened into the living room. Responding officers found Zena in the hallway at the back of the living room, with her two small children next to her in a pool of blood. Ernestine and Nathaniel were found in their shared bedroom.

At approximately 4:00 a.m. on the day of the murders, Detective James Cooper interviewed Sonyae and her neighbor Sharon Carter at the police station. Carter told Detective Cooper that she saw a "tall" man run from the Halfords' apartment after the shootings, and that the man was wearing a dark Starter jacket, black Nike shoes, dark jeans, and a stocking cap. As for Sonyae, she told Detective Cooper that she believed two men had committed the murders. She believed the man that Carter saw was her ex-boyfriend Rankin because Rankin was around 6'3" and had repeatedly threatened to kill her family. The second man was the man who opened her bedroom door. She told Detective Cooper that she had not seen the man's face, but he was "shorter" than Rankin, had "short legs," and was wearing "some blue dickey like, dickey pants and a black jacket" with "writing or a picture" on the back of the jacket. Detective Cooper asked Sonyae where he might find Rankin, and she directed him to the home of Rankin's mother, Elaine Trimble.

Officers arrived at Elaine's home at around 8:00 a.m. Rankin answered the door. He had been sleeping on the living room couch. Officers searched the home and found a black and gray Starter jacket with a "Sox" emblem on the back and six pairs of dark-colored jeans behind a chest of drawers in Rankin's bedroom. They also found a pair of size 12, navy Reebok tennis shoes underneath the living room couch where Rankin had been sleeping. The officers arrested Rankin and transported him to the police station.

At approximately 10:45 a.m., Detective Cooper began questioning Rankin about the murders. For about two and a half hours, Rankin denied any involvement. Detective Cooper then learned that officers had found what they believed to be the murder weapon—a nine-millimeter Hi-Point pistol—in a drainage ditch behind the Halfords' apartment. Detective Cooper showed the pistol to Rankin. Once Rankin saw the pistol, he told Detective Cooper, "You don't have to show me that because I'm going to talk to you." Rankin then confessed. He told Detective Cooper that he walked to the Halfords' apartment. After he broke into the apartment, he saw "Zena . . . and the kids" who were "on the couch." He confessed that he shot Zena first, Ernestine second, and Nathaniel third. He said that he "knew Sonyae was in

there," but left without shooting her because he "got scared." He concluded: "[T]his is not what I meant to happen and I'm sorry, but I know that won't bring them back."

Forensic examiners subsequently detected human blood on the Reebok shoes as well as on one pair of jeans seized from Rankin's bedroom. Examiners also determined that the Reebok shoes found underneath the living room couch matched the general size and pattern of the shoe that kicked in the front door of the Halfords' apartment. Examiners were unable to definitively determine that the two shoes were the same due to the quality of the shoeprint from the crime scene. In addition, the pistol found in the drainage ditch was forensically linked to shell casings found at the scene of the crime. The pistol also was traced to a recent burglary of a local fireman's home. Other items stolen during that burglary—a VCR and CDs—were found in Elaine's home. The VCR was discovered in a laundry basket underneath some clothes.

Various witnesses testified at trial, including Sonyae and Rankin. Sonyae testified that she met Rankin through her sister Zena. Zena previously lived with Rankin's brother, Rodney, with whom she had two children.[4] Sonyae described her relationship with Rankin as violent and tumultuous. Rankin had hit her on several occasions and repeatedly threatened to kill her family. Sonyae further testified that she had broken up with Rankin shortly before the murders. But, while Sonyae told Detective Cooper that the man she saw from her bedroom closet was too short to be Rankin, she testified at trial that she was sure the man she saw was Rankin because she recognized his clothes. Sonyae testified that the shooter had been wearing a black and gray Starter jacket, blue jeans, and navy and white tennis shoes. According to Sonyae, these items belonged to Rankin.

As for Rankin, he testified that officers fed him information about the murders prior to his taped confession and that he only confessed because the officers

_____

[4]These were the two children present in the Halfords' apartment when the murders occurred.

threatened to arrest his mother and brother. Rankin said he was concerned for his mother because she "had already been through a lot," and that he was concerned for his brother because his brother had been angry with Zena, "smoking crack," and "acting funny." Rankin clarified that he was not "suggesting" that his brother had anything to do with the murders. In addition, Rankin admitted that the Starter jacket and the six pairs of jeans found in his bedroom belonged to him, and that he owned a pair of Reebok shoes. However, he stated that he had not been wearing these clothes or shoes on the day of the murders. And, while he admitted that he had placed the VCR in the laundry basket, he testified that he had only placed the VCR there because he did not want his mother to find it. He claimed that he had obtained the VCR and CDs from a friend and that he was not aware the items had been stolen.

Rankin was found guilty of three counts of capital murder and sentenced to death for each count. Rankin's conviction and sentence were affirmed on direct appeal, and his attempts at post-conviction relief in state court were similarly unsuccessful. *See Rankin v. State*, 948 S.W.2d 397 (Ark. 1997); *Rankin v. State*, 1 S.W.3d 14 (Ark. 1999); *Rankin v. State*, 227 S.W.3d 924 (Ark. 2006). Thereafter, Rankin filed a habeas petition in federal district court. The district court determined that Rankin had not exhausted all of his state court claims and stayed the habeas proceeding to allow Rankin to pursue relief on unexhausted claims in state court.

In 2009, Rankin's habeas investigator approached Pastor Augustine Bailey, a seriously ill ordained minister who previously counseled Elaine and Rodney. Bailey told the habeas investigator that Rodney twice confessed to her that he had committed the murders. Bailey stated that she had not told anyone about Rodney's confessions because she believed that, while Rodney and Elaine were alive, she was bound to confidentiality by her role as a minister and counselor. According to Bailey, she was no longer bound to confidentiality because Rodney died in 2006 and Elaine died in 2009. To preserve Bailey's testimony, the district court temporarily reopened the habeas proceeding. Bailey was deposed by video in 2010. She died in 2011.

Back in state court, Rankin filed a motion in the Arkansas Supreme Court to recall the mandate and reinvest jurisdiction in the state trial court to consider a petition for a writ of *error coram nobis*. Rankin claimed that he was actually innocent of the murders and that his now-deceased brother Rodney committed them. Rankin attached an appendix to his motion, which contained many documents that were not a part of the original state court record. The Arkansas Supreme Court summarily denied the motion.

Having exhausted his state remedies, Rankin returned to federal court and filed an amended habeas petition. As relevant here, Rankin claimed that (1) he was intellectually disabled at the time of the murders, (2) trial counsel was ineffective for failing to investigate and present evidence that his brother Rodney committed the murders, (3) trial counsel labored under multiple conflicts of interest, (4) the penalty-phase jury instructions violated *Mills* and *McKoy*, and (5) trial counsel was ineffective for failing to object to the penalty-phase jury instructions. Rankin acknowledged that the last four claims were procedurally defaulted because he had not raised them in state court. Nevertheless, he argued that procedural default was excused and that the claims should be considered on the merits.

The district court denied habeas relief. As to the intellectual disability claim, the district court noted that it was required to accord deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") to the state court's determination that Rankin was not intellectually disabled. According to the district court, Rankin had not pointed "to clear and convincing evidence contradicting the state-court determination that he [was] not intellectually disabled." As to the remaining four claims, the district court declined to determine whether procedural default was excused. Instead, it concluded that habeas relief was not warranted as all four claims failed on the merits.

## II.

We review the district court's factual findings for clear error and its legal conclusions *de novo*. *Frey v. Schuetzle*, 151 F.3d 893, 897 (8th Cir. 1998). We review the district court's denial of a habeas petitioner's request for an evidentiary hearing for an abuse of discretion. *Johnston v. Luebbers*, 288 F.3d 1048, 1059 (8th Cir. 2002).

## A.

We first address the only claim that was not procedurally defaulted—whether Rankin was intellectually disabled when he committed the murders. *See Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that the execution of the intellectually disabled violates the Eighth Amendment's prohibition against "cruel and unusual punishments"). For the reasons set forth below, we conclude that habeas relief is not warranted on this claim.

## 1.

Prior to Rankin's trial, the state court ordered that the Southeast Arkansas Mental Health Center evaluate Rankin. On February 15, 1995—less than two months after the murders—Rankin was evaluated by David Nanak, a psychological examiner, and Dr. William James, a psychiatrist. Nanak reported that Rankin had a full-scale IQ of 66, which placed him in the "[m]ild range of [m]ental [r]etardation." Although Rankin stated that he had completed the eighth grade, Nanak reported that Rankin's academic achievement was at or below the fifth grade level. He also noted that Rankin appeared to be suffering from "[e]levated levels of anxiety and tension," but that he "appeared to put forth good effort in the testing." As for James, he reported that Rankin had "[m]ental [r]etardation, mild." He noted that Rankin gave inconsistent answers throughout the interview, "relate[d] in a very passive-resistive

-7-

manner with limited anxiety," and "appear[ed] to weigh his remarks prior to responding."

Rankin filed a motion for a second evaluation, claiming that he was entitled to retain Dr. Phillip Murphy, a private clinical psychologist, at the State's expense. The trial court granted the motion, and Murphy examined Rankin on August 24, 1995. Murphy reported that Rankin had a full-scale IQ of 72, which placed him in the "mildly to borderline mentally retarded" category. He also reported that Rankin had "a history of special education in school."

The trial court subsequently ordered that a third evaluation be conducted—this time by the Arkansas State Hospital. On November 2, 1995, Dr. John Anderson, a psychologist, evaluated Rankin. Anderson did not conduct a formal psychological assessment as Rankin declined to participate in one. After conducting an interview with Rankin, Anderson reported that Rankin "was evasive and minimally cooperative." He concluded: "In the examiner's opinion, Mr. Rankin is intentionally reporting symptoms of a mental illness for secondary gain. He has been inconsistent in what he reports from prior evaluations, and has been evasive in providing factual information."

After the evaluations were completed, the trial court held a hearing to determine whether Rankin was intellectually disabled under Arkansas law.[5] Three witnesses testified: Nanak, Anderson, and Barbara Hubanks. Hubanks was one of Rankin's junior high school teachers. Nanak noted that he had diagnosed Rankin with an IQ score of 66 and "mild mental retardation."[6] He stated that he believed

---

[5]Because "[t]he Arkansas Supreme Court has consistently construed its state's statutory right to be concurrent with the federal constitutional right established in *Atkins*," it is immaterial that the state court determined that Rankin was not intellectually disabled under Arkansas law as opposed to under *Atkins*. *Roberts v. Payne*, 113 F.4th 801, 808 (8th Cir. 2024).

[6]Nanak clarified that he used the term "mental retardation" in a psychological sense, not in a legal sense.

Murphy's score of 72 to be "probably more valid, more accurate" because (1) the score of 66 was obtained shortly after Rankin's incarceration—meaning that Rankin would have been operating at a higher anxiety level, which would produce lower intellectual functioning; (2) the score of 72 was more in line with Rankin's standardized test scores from school; and (3) Rankin had "probably fooled" him in that Rankin had intentionally tried to obtain a lower IQ score. Defense counsel questioned whether Rankin's improved IQ score was due to the "test-retest effect," where increased familiarity with a test produces better results. Nanak responded that, in his "years of experience with mental retardation," he had not seen the presence of a test-retest effect. And, in any event, one would not expect to see a six point increase due to it. Nanak also testified that Rankin's level of adaptive functioning was "acceptable."

Anderson testified that the results obtained by Nanak and Murphy were both "probably reasonable assessments of Mr. Rankin's functioning at the time he was evaluated." Nevertheless, he stated that he believed Rankin was "over reporting symptoms," and that the test-retest effect was inapplicable because the areas in which improvement occurred were not areas that would have been affected by a test-retest effect. As for Hubanks, she testified that she had taught Rankin "mathematics lab" for two years. She stated that Rankin had been in her class because he was "below grade level," but clarified that her class was "[i]n no way" a special education class. She also testified that, based on her observations, Rankin appeared to have acceptable levels of adaptive functioning. After hearing this testimony, the trial court found that Rankin had not demonstrated intellectual disability under Arkansas law.

**2.**

To establish intellectual disability, Rankin must show that, at the time of the murders, (1) he had significant below-average general intellectual functioning, (2) he had significant deficit or impairment in adaptive functioning, (3) both of the above manifested before age eighteen, and (4) he had a deficit in adaptive behavior.

*Roberts*, 113 F.4th at 808 (citing Ark. Code Ann. § 5-4-618(a)(1)). As to the first prong, an IQ of 70 or below is generally deemed to fall within the range of significantly below-average general intellectual functioning. *Id.* at 810. However, an IQ test score alone is not dispositive, and a court must consider "all evidence of [a defendant's] intellectual functioning rather than relying solely on his IQ test scores." *Sasser v. Hobbs*, 735 F.3d 833, 847 (8th Cir. 2013). The second prong, which considers whether Rankin had significant deficit or impairment in adaptive functioning, "is met if an individual ha[d] significant *limitations* in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Id.* at 845 (internal quotation marks omitted). The fourth prong "duplicates the second prong, but places no age requirement on the evidence used to establish limitations in adaptive behavior." *Id.* (internal quotation marks omitted).

Since "[t]he review on whether a defendant is intellectually disabled—and thus, spared from execution—belongs in the first instance to the states," we apply the AEDPA deference to the state court's conclusion that Rankin was not intellectually disabled. *Roberts*, 113 F.4th at 808. Accordingly, habeas relief can only be granted if the state court's adjudication of Rankin's intellectual disability claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).[7]

The Arkansas Supreme Court's rejection of Rankin's intellectual disability claim was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. As to the first prong (significantly below-average general intellectual functioning), Rankin's IQ score of 72 was above

---

[7]Habeas relief is also warranted if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). Rankin does not dispute that this standard is not met, so we do not address it.

the threshold score of 70. Although Rankin initially obtained an IQ score of 66, Nanak testified that the score of 72 was "probably more valid, more accurate" than the score of 66 because (i) the score of 66 was obtained shortly after Rankin's incarceration—meaning that Rankin would have been operating at a higher anxiety level, which would produce lower intellectual functioning; (ii) the score of 72 was more in line with Rankin's standardized test scores from school; and (iii) Nanak believed that Rankin had intentionally tried to obtain a lower IQ score. In addition, both Nanak and Anderson testified that they did not believe that Rankin's IQ score had increased from 66 to 72 due to a test-retest effect. And, as to the second and fourth prongs (adaptive functioning), both Nanak and Hubanks testified that they believed Rankin had acceptable levels of adaptive functioning. In light of this evidence, it was not unreasonable for the state court to conclude that Rankin was not intellectually disabled.

Rankin raises several arguments against this conclusion, all of which we find unpersuasive. First, he claims that the Arkansas Supreme Court's decision was based on an unreasonable determination of the facts because the Arkansas Supreme Court focused solely on the score of 72 and essentially ignored the score of 66. There is no indication, however, that the Arkansas Supreme Court ignored the score of 66. Indeed, the Arkansas Supreme Court noted several times in its opinion that Rankin had scored 66 the first time he was evaluated by Nanak. *See Rankin v. State*, 948 S.W.2d 397, 403-04 (Ark. 1997). Ultimately, the Arkansas Supreme Court determined that "substantial evidence" supported a finding that the score of 72 was more credible. *Id.* at 404. In light of the evidence in the state court record, the finding was not an unreasonable determination for the Arkansas Supreme Court to make.

Second, Rankin contends that the Arkansas Supreme Court improperly credited Nanak with having conducted a *formal* adaptive functioning assessment. According to Rankin, Nanak could not opine on Rankin's level of adaptive functioning because he did not first conduct a formal assessment. There is no indication, however, that the Arkansas Supreme Court credited Nanak with having

conducted a formal adaptive functioning assessment. Furthermore, Rankin admits in his brief that medical professionals can opine on an individual's level of adaptive functioning based solely on their "professional judgment." Thus, by Rankin's own admission, Nanak was not required to conduct a formal adaptive functioning assessment.

Finally, perhaps recognizing that the state court record does not support his intellectual disability claim, Rankin argues that he is entitled to an evidentiary hearing in order to expand the state court record. In an evidentiary hearing, Rankin seeks to introduce testimony and reports from two medical professionals who examined Rankin over a decade after the murders and concluded that Rankin was intellectually disabled. An evidentiary hearing, however, is barred under the AEDPA. *See* 28 U.S.C. § 2254(e)(2) (barring an evidentiary hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings").[8] Accordingly, we conclude that the district court properly denied habeas relief without an evidentiary hearing.

**B.**

We next address the four claims that were procedurally defaulted, namely that: (1) trial counsel was ineffective for failing to investigate and present evidence that Rodney committed the murders, (2) trial counsel labored under multiple conflicts of interest, (3) the penalty-phase instructions violated *Mills* and *McKoy*, and (4) trial counsel was ineffective for failing to object to the penalty-phase instructions. After careful review, we conclude that habeas relief is not warranted.

---

[8]Rankin argues that an evidentiary hearing is required under *Simpson v. Norris*, 490 F.3d 1029 (8th Cir. 2007). However, we rejected a virtually identical argument in *Roberts*. *See* 113 F.4th at 809 (declining to extend *Simpson*).

**1.**

Federal courts are generally precluded from reviewing the merits of procedurally defaulted claims. *Schlup v. Delo*, 513 U.S. 298, 314-315 (1995). An exception exists where failure to consider the claims on their merits could amount to a fundamental miscarriage of justice. *Id.* A petitioner demonstrates a fundamental miscarriage of justice if he shows that he is actually innocent of the crime. *Id.* at 321. This is known as the "gateway innocence claim" because it is the gateway through which a petitioner must pass in order to have procedurally defaulted claims considered on the merits. *See id.* at 315 n.30.

Rankin requests an evidentiary hearing on whether he is actually innocent so that he may pass through the actual innocence gateway and have his procedurally defaulted claims heard on the merits. For Rankin to obtain an evidentiary hearing, he must make a threshold showing of actual innocence. *See id.* at 301, 317. This means he must establish that, "in light of the new evidence," "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Id.* at 327. Evidence is "new" if it was unavailable at trial and "could not have been discovered earlier through the exercise of due diligence." *Amrine v. Bowersox*, 128 F.3d 1222, 1230 (8th Cir. 1997).[9]

Rankin asserts that he has made a threshold showing of actual innocence because new evidence shows that his brother Rodney committed the murders. In support of this contention, Rankin points to various documents in his *error coram nobis* appendix, which he claims link Rodney to the murders. We describe here the

---

[9]Rankin asserts that *Amrine*'s "due diligence" requirement was abrogated by *McQuiggin v. Perkins*, 569 U.S. 383 (2013). But *McQuiggin* dealt with a different issue—whether unjustifiable delay in bringing a habeas petition served as a complete bar to relief. *See id.* at 399-400. This circuit has repeatedly held post-*McQuiggin* that evidence is not new if it could have been discovered earlier through the exercise of due diligence. *See Barton v. Strange*, 959 F.3d 867, 872 (8th Cir. 2020); *Nash v. Russell*, 807 F.3d 892, 899 (8th Cir. 2015).

relevant documents. First, the appendix includes Bailey's testimony. According to Bailey, a few weeks prior to the murders, Rodney told Bailey that he "could kill" Zena. Then, a few days after the murders, Bailey and Rodney were at church for a clothing drive when Rodney pulled her aside. Rodney told her: "What if these are the feet, the shoes that kicked the door in over there, and this is the blood that's on my shoe from it?" Bailey looked down and saw blood on Rodney's shoes, which she described as dark-colored Converse-type shoes with white soles. Rodney then raised his arms and said: "What if this is the jacket that they saw the person that had did the killings running away in?" He told Bailey that he was "going to talk to his brother and have him take the fall." Then, about a week later, Bailey visited Elaine and Rodney for a counseling session. The three of them were in Elaine's home when Rodney "just blurted out his mouth," "I did it."

Second, the appendix contains affidavits from various friends and family members of Rodney and Rankin. The affidavits were all obtained over a decade after the murders. Essentially, the affiants state that they do not believe that Rankin could have committed the murders, but that Rodney could have. They describe Rodney as violent and his relationship with Zena as tumultuous. The family members protest that the Reebok shoes could not have belonged to Rankin because he wore size 14 shoes, whereas Rodney had smaller feet, possibly size 12. They also state that Rodney was heavier-set and shorter than Rankin.

Third, the appendix includes a petition to set child support. According to the petition, on October 12, 1994, Zena requested that the Jefferson County Child Support Enforcement Unit order Rodney to pay a reasonable sum in child support. Fourth, the appendix includes prison records, which state that Rankin was issued size 14 shoes. Fifth, the appendix includes photocopied pages from the defense counsel's brief in the post-conviction proceeding, which indicate that the blood-stained pants from Rankin's bedroom was several inches shorter and wider at the

-14-

waist than the other pants found in the same location.[10]   And, sixth, the appendix includes an affidavit from Rankin's trial counsel, Gene McKissic.  In the affidavit, McKissic states that, prior to trial, Rankin told him that Rodney confessed to Rankin that he had committed the murders.  McKissic also states that he learned from an unnamed detective that Rodney was the "prime suspect" in the murder of Paula Rankin, who was Rodney and Rankin's sister.

We conclude that Rankin has not made a threshold showing of actual innocence because the evidence he points to is not "new."  The primary basis of Rankin's actual innocence claim—that Rodney committed the murders—was actually known and available to Rankin before trial.  Prior to trial, Rankin told his defense counsel that Rodney confessed to him that he had committed the murders.  Despite this, no evidence was put forth at trial to corroborate Rodney's supposed guilt.  Even Rankin himself testified at trial that he was not "suggesting" that Rodney had anything to do with the murders.  Although Rankin claims that Bailey's deposition is "new" in that she did not testify until 2010, evidence is not "new" if the factual basis for it "could have been discovered earlier in the exercise of due diligence."  *Meadows v. Delo*, 99 F.3d 280, 282 (8th Cir. 1996).  It is true that Bailey's deposition was not available until well after Rankin's trial.  Nevertheless, the factual basis for it—that Rodney committed the murders—existed prior to trial. *See id.* ("Although the affidavit itself was not available until after Meadows's trial, the factual basis for it existed long before this appeal."); *United States v. Bell*, 761 F.3d 900, 911 (8th Cir. 2014) ("We have recognized that a witness's failure to appear before trial to exculpate a defendant . . . does not constitute newly discovered evidence."); *United States v. Rogers*, 982 F.2d 1241, 1245 (8th Cir. 1993) (stating that a letter from a codefendant which exculpated the defendant was not newly discovered evidence because the codefendant "maintained his silence during the trial and submitted [the] letter only as a post-trial statement").  Rankin thus points to no new evidence to rebut the significant evidence presented at trial showing his guilt.

_____

[10]Even though reports and testimony pertaining to the blood stains were ultimately excluded from trial, we refer to the blood-stained pants here as Rankin asserts on appeal that those pants in particular did not belong to him.

Because Rankin has not made a threshold showing of actual innocence, he is not entitled to an evidentiary hearing, and his claims are procedurally defaulted.[11]

**2.**

Because Rankin has not overcome procedural default, we need not consider the merits of his claims.  However, this being a capital punishment matter, "it would not be inappropriate to discuss the merits of [his] claim[s]." *Joubert v. Hopkins*, 75 F.3d 1232, 1244 (8th Cir. 1996); *see, e.g.*, *Winfield v. Roper*, 460 F.3d 1026, 1040 (8th Cir. 2006); *Williams v. Kelley*, 854 F.3d 1002, 1008 (8th Cir. 2017); *Williams v. Norris*, 612 F.3d 941, 959 n.9 (8th Cir. 2010).  We address each claim in turn.

*First*, Rankin claims that trial counsel, Gene McKissic, was ineffective for failing to investigate and present evidence that Rodney committed the murders. Rankin contends that, had counsel properly investigated, he could have introduced evidence that: (1) the size 12 Reebok shoes belonged to Rodney, (2) the blood-stained jeans belonged to Rodney, (3) Rodney had significant motive to commit the murders, and (4) Rodney had a violent character.

To demonstrate ineffective assistance of counsel, Rankin must show that his attorney's performance was deficient and outside the range of reasonable professional assistance and that he was prejudiced by his counsel's deficient performance to the extent that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different.  *See Strickland v. Washington*, 466 U.S. 668, 687, 689, 694 (1984).  "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691.

---

[11]We decline to address whether an evidentiary hearing is further barred under *Shinn v. Ramirez*, 596 U.S. 366 (2022) and 28 U.S.C. § 2254(e)(2).

Trial counsel's decision not to investigate for evidence of Rodney's supposed guilt was reasonable given the lack of evidence pointing to Rodney. With respect to the Reebok shoes, it is true that prison records corroborate that Rankin wore size 14 shoes. However, the only evidence purporting to show that Rodney wore size 12 shoes are recollections from family members over a decade after the murders. Moreover, significant evidence at trial pointed to the Reebok shoes belonging to Rankin, not Rodney. The Reebok shoes were discovered underneath the couch where Rankin had been sleeping, Sonyae testified that they belonged to Rankin, and Rankin even admitted at trial that he owned a pair of Reebok shoes. As to the seized pants, McKissic admits in an affidavit that he "overlooked using the size difference in the pants seized from the Rankin house." While McKissic's performance may not have been perfect, we cannot say that he was unconstitutionally ineffective for failing to investigate the size of the seized pants. The pants were discovered in Rankin's bedroom, Rankin admitted at trial that he put those pants there, and Rankin points to no evidence which shows that those pants belonged to Rodney. Finally, testimony about Rodney's motive and character would have been excluded under Arkansas law. *See Zinger v. State*, 852 S.W.2d 320, 323 (Ark. 1993) (stating that, under Arkansas law, "mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt"). Given the lack of evidence pointing to Rodney, McKissic's decision not to investigate and present evidence of Rodney's purported guilt was reasonable. Even Rankin himself testified at trial that he was not "suggesting" that Rodney had anything to do with the murders. Accordingly, we conclude that Rankin's first claim fails.

*Second*, Rankin claims his trial attorney, McKissic, was ineffective because he labored under multiple conflicts of interest in that he previously represented (i) Rankin's brother, Rodney, in a child custody dispute between Rodney and Bessie Henderson—the mother of three of Rodney's children—and (ii) Rodney and Rankin's stepfather, Earl Trimble, on charges that Earl sexually abused Rankin's sister, Paula. According to Rankin, these conflicts prevented McKissic from putting

on evidence that Rodney committed the murders and that Earl sexually abused him as a child.

In ineffective assistance of counsel cases, we ordinarily ask whether the petitioner has shown deficient performance and prejudice under *Strickland*. However, in *Cuyler v. Sullivan*, 446 U.S. 335, 349-50 (1980), the Supreme Court held that a defendant who "shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief" based on ineffective assistance of counsel. "Effect on representation means that the conflict caused the attorney's choice [to engage or not to engage in particular conduct], not that the choice was prejudicial in any other way." *Covey v. United States*, 377 F.3d 903, 908 (8th Cir. 2004) (internal quotation marks and alteration omitted). The defendant must "identify a plausible alternative defense strategy or tactic that defense counsel might have pursued, show that the alternative strategy was objectively reasonable under the facts of the case, and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." *Winfield v. Roper*, 460 F.3d 1026, 1039 (8th Cir. 2006) (internal quotation marks omitted). In this circuit, it is unclear whether *Strickland* or *Cuyler* applies to the types of conflicts of interest that are alleged in this case.

We begin and end with *Cuyler*'s analysis as a defendant who does not show that a conflict of interest actually affected the adequacy of his representation under *Cuyler* necessarily fails to meet *Strickland*'s "more stringent standard." *Sharp v. United States*, 132 F.4th 1094, 1099 (8th Cir. 2025). Here, Rankin identifies two alternative defense strategies that McKissic might have pursued absent the alleged conflicts. First, Rankin argues that McKissic could have presented evidence casting suspicion on Rodney as the murderer. Second, Rankin argues that McKissic could have presented mitigating evidence at the sentencing phase that Earl abused him as a child.

We conclude that Rankin's arguments are meritless. With respect to Rodney, it was not objectively reasonable for McKissic to present evidence casting suspicion on Rodney as the murderer. As we have detailed above, little evidence linked Rodney to the crime. Even Rankin himself testified that he was not "suggesting" that Rodney had anything to do with the murders. And, as to Earl, Murphy testified at trial that an "adult male"—this adult male being Earl—"sexually abused [Rankin] probably five or six times" when Rankin "was approximately 10 or 11 years of age." Although Rankin contends that Murphy's testimony should have been substantiated through documents or witnesses, Rankin offers no evidence that McKissic's decision to present that evidence through Murphy, as opposed to some other means, was due to the actual conflict. Accordingly, we conclude that Rankin's second claim fails.

*Third*, Rankin claims that the jury instructions related to mitigating evidence violated *Mills* and *McKoy*. *Mills* and *McKoy* stand for the proposition that the Constitution requires "that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death." *McKoy*, 494 U.S. at 442-43 (discussing *Mills*). The Constitution is violated when "there is a substantial probability that reasonable jurors, upon receiving the judge's instructions . . . and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 384.

Before closing arguments, the state trial court read from Arkansas's model jury instructions. The model jury instructions consisted of four forms: Form 1: Aggravating Circumstances, Form 2: Mitigating Circumstances, Form 3: Conclusions, and Form 4: Verdict. Tracking the model jury instructions, the trial court instructed the jury that, if it unanimously found beyond a reasonable doubt the existence of an aggravating circumstance listed on Form 1, then it must complete Form 2. The trial court then read Form 2, Part A, which instructed the jury to checkmark that part if the jury "*unanimously* [found] that the following mitigating circumstance(s) probably existed." The trial court did not read or refer to Parts B,

-19-

C, or D of Form 2. Part B of Form 2 directed the jury to checkmark that part if "[o]ne or more members of the jury believed that the following mitigating circumstance(s) probably existed, but the jury did not unanimously agree that such mitigating circumstance(s) probably existed." The trial court next read Form 3. As relevant here, Part B of Form 3 instructed the jury to weigh the aggravating and mitigating circumstances. The trial court told the jury to checkmark Part B of Form 3 if it found that "[t]he aggravating circumstances outweigh beyond a reasonable doubt *any mitigating circumstance found by any juror to exist.*"

Rankin claims that the jury instructions violated *Mills* and *McKoy* because reasonable jurors would have believed that, in reviewing Form 3, they were required to weigh the aggravating factor against only those mitigating factors that were *unanimously* found, as opposed to those *found by any juror to exist*. It is true that, when informing the jury about Form 2, the trial court read only Part A, which instructed the jury to checkmark that part if the jury "*unanimously* [found] that the following mitigating circumstance(s) probably existed." The trial court did not read or refer to Part B of Form 2. But, "[i]n determining the effect of [a challenged] instruction on the validity of [a] conviction, [courts] must accept at the outset the well-established proposition that a single jury instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Boyde v. California*, 494 U.S. 370, 378 (1990). Any potential error the trial court made in reading only Part A of Form 2 was rectified when the trial court directed the jury on Form 3 to consider "any mitigating circumstance *found by any juror to exist.*" Accordingly, we conclude that Rankin's third claim fails.

*Fourth*, Rankin claims that trial counsel was ineffective for failing to object to the penalty-phase instructions. As discussed previously, the jury instructions were not unconstitutional, so Rankin cannot show deficient performance or prejudice under *Strickland*. Accordingly, we conclude that Rankin's fourth claim fails.

Finally, we address Rankin's request for an evidentiary hearing on his claims of ineffective assistance of counsel. "Generally, a habeas petitioner is entitled to an evidentiary hearing in federal court if the petition alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing." *Toney v. Gammon*, 79 F.3d 693, 697 (8th Cir. 1996) (internal quotation marks omitted). An evidentiary hearing is unnecessary "if the record clearly indicates that the petitioner's claims are either barred from review or without merit." *Id.* As we have discussed previously, Rankin's claims are without merit. Thus, the district court did not abuse its discretion in denying an evidentiary hearing on Rankin's claims of ineffective assistance of counsel.

## III.

For the foregoing reasons, we affirm the judgment of the district court.

_____